### ROGER BLAIN v. THE STATE.

*No. 355.    Decided April 26.*

1. **Murder—Expert Opinion Evidence as to Position of Deceased's Arm at Time of Killing Inadmissible.**—On a trial for murder it is not error for the court to refuse to permit an expert witness to give his opinion as to the position of deceased's arm at the time he received the fatal shot.

2. **Same—Evidence—Acts and Declarations of a Codefendant in Absence of Defendant—Conspiracy.**—Whilst it is settled law that a conspiracy can not be proved by the acts and declarations of one party in the absence of another, and that to be admissible such acts and declarations must relate to and be in furtherance of a common design, and be made during the existence of the conspiracy, yet where a prima facie case of conspiracy is established by the evidence, such declarations and acts are admissible to ascertain the existence of the common design and relations of the parties to the conspiracy.

3. **Same—Distinction as to Rules Where Conspiracy is Charged as a Substantive Crime, and Where as an Incidental Issue to the Crime Charged.**—Where a conspiracy, as a substantive crime, is charged as provided in Penal Code, article 800 et seq., the necessity of a strict compliance with the rules of evidence as to the admissibility of antecedent acts and declarations of one conspirator against another is both obvious and required. But where the conspiracy is shown beyond question by the presence and acting together of the parties, the rules have not the same force, since the question then is complicity in the crime committed rather than in the conspiracy which led to it. In either event, if *the time* of the formation of the conspiracy be a question of fact, that question is one properly to be submitted to the jury in connection with such acts and declarations.

4. **Same—Harmless Error—Charge.**—Where proof aliunde establishing the conspiracy is so clear and conclusive as to negative the probability that the jury could have relied on antecedent acts and declarations solely in finding the existence of a conspiracy, such acts and declarations are admissible to throw light on the motive and conduct of the parties acting together in the commission of the crime; and if they relate to and are in furtherance of the identical purpose actually carried out, their admission can seldom be otherwise than correct or harmless, especially when properly controlled by the charge of the court.

5. **Same.**—On a trial for murder, where the theory of the defense was that a co-defendant was compelled to kill deceased in self-defense, the antecedent acts, conduct, and threats of such codefendant are admissible as evidence to rebut such defense, and especially so where defendant's own relationship to the party, his threats, and conduct are such as to authorize the jury to infer that he had full notice of his codefendant's purpose before a conspiracy was formed and agreed to.

6. **Same.**—Where one originates a criminal purpose and induces another to assist in its execution, knowing and concurring therein, and this guilty knowledge and con-currence is shown by evidence aliunde, then the acts and declarations of the principal can be shown in evidence to prove guilty purpose, though occurring anterior to the conspiracy; and one who enters into a conspiracy already formed between two or more becomes responsible for every relevant act and statement of each conspirator transpir-ing before he entered into the conspiracy, though he in fact was ignorant of them.

7. **Case Explained and Distinguished.**—See explanation as to what was ruled on this subject in Harris v. The State, 31 Texas Criminal Reports, 414, and the dis-tinction shown between the issues involved in that and in this case.

8. **Principal Offenders.**—All persons are principals who are guilty of acting to-gether in the commission of an offense (Penal Code, article 74), and any person who advises or agrees to the commission of an offense, and who is present when the same is committed, is a principal thereto, whether he aids or not in the illegal act. Penal Code, art. 78.

9. **Same—Threats.**—On a trial for murder, where the evidence shows that the defendant was a principal in the crime, no prior threats can add force to the facts of deliberate preparation for and execution of the formed design.

APPEAL from the District Court of Gonzales. Tried below before Hon. M. KENNON, Special Judge.

In January, 1892, Roger Blain, this appellant, and J. N. Blain and Otho Askey were jointly indicted for the murder of G. C. Barber. There was a severance by the defendants, and Roger Blain, the appel-lant, having been put upon trial, was convicted of murder in the second degree, the punishment affixed being five years in the State penitentiary. That case was appealed to the Court of Appeals and the judgment was reversed. 30 Texas Crim. App., 702. After the reversal of that case, to wit, in July, 1892, J. N. Blain, one of the co-defendants, applied for and was granted a change of venue in his case to Bexar County, and the original joint indictment against these par-ties having been sent with the record on change of venue to Bexar County, a new indictment for the same murder was returned and pre-sented by the grand jury against appellant alone at the January Term, 1893, of the District Court of Gonzales County. This appeal is from a judgment of conviction under this second indictment for murder in the second degree, the punishment being again assessed at five years' imprisonment in the penitentiary. The circumstances immediately at-tendant on the homicide will be found sufficiently stated in the former opinion in this case (30 Texas Criminal Appeals, 702), and in the opin-ion of Judge Simkins, below. As illustrative of the main question discussed in the opinion on this appeal, that is, the admissibility in

evidence of the threats and declarations against deceased made by J. N. or Joe Blain prior to the killing, the following concise statement of the evidence is taken from the brief of counsel for the State on that point:

Roger Blain and J. N. Blain are brothers. Barber was killed on August 31, 1891, by J. N. Blain, the defendant being present. In January, 1889, J. N. Blain, in the presence of defendant, speaking of deceased, said he was going to kill the long-nosed son-of-a-bitch. In January, 1890, defendant said he and John Blain would, or ought to, do deceased up, if they ever got a chance.

In December, 1890, J. N. Blain told J. C. Dilworth that he had been badly treated; that there was one d—d son-of-a-bitch he was going to kill, and that was Clark Barber; that they could not live in the same country. Dilworth told him that if he killed Barber he would be hung; to which Blain answered he would fix that; he would have his witnesses there; that he would rather have good witnesses than good lawyers. Roger Blain was not present.

H. L. Kokernot testified, that he had heard J. N. Blain make threats against deceased several times. About April before the killing heard J. N. Blain say that he would kill deceased then, but that his (Blain's) name would hang him. About two years ago (sic) J. N. Blain and Barber had a fight in front of witness' store. At that time Blain said he was going to kill the d—d son-of-a-bitch, meaning deceased, and go back to the penitentiary.

On the day of the killing, and several hours before, codefendant Askey and deceased had an altercation about what Askey had heard deceased had said about him, Barber denying that he had said anything of the sort, and that the man who had said so was a lying son-of-a-bitch, and accusing Dan Jacks of being the man. Askey denied this, and said he would go and bring the man. Askey went and hunted up defendant, and they together hunted and found J. N. Blain, and the three were seen in earnest and close conversation. They then separated, J. N. Blain borrowing a horse from John Peck and riding off in the direction where Dan Jacks then resided, or had recently been residing, while defendant and Askey went to A. J. Moore's gunshop, where they rented two pistols. Shortly afterwards the three were seen together again near the southwest corner of the square, and there separated again, J. N. Blain going around the south side of the square, while defendant and Askey went around the north side, all entering Logan's saloon, where the killing occurred, at or about the same time.

On the morning of the day on which the killing occurred, Joe Blain told Colley Munford that deceased had bailed a negro out of jail to use as State's evidence against him (Blain); that he was going down and kill him, and that he wanted witness to go down and make him a witness. About two weeks after the killing defendant informed witness

that deceased started to get a Winchester, and J. N. Blain followed him, and as deceased tried to raise the gun Blain fired, and as deceased fell he tried again to raise the gun, and Blain shot him again; that defendant went up; deceased tried again to raise the gun, and defendant put his foot on it; that as Barber was going towards the gun defendant pulled his pistol half out; that J. N. Blain drew his pistol and offered it to Barber so as to get the drop on him.

T. H. Munford testified, that about the middle of September after the killing defendant told him that Askey had heard of the threats made by deceased, and had asked deceased about it; that Barber had denied it, and Askey had promised to produce the man who informed him; that Askey had told defendant and J. N. Blain about it, and that J. N. Blain had told them, "You and Roger go over there, and I will come over and kill the d—d son-of-a-bitch;" that they went over, and Joe Blain came over and killed Barber.

On the question of threats, etc., by the codefendants, the court instructed the jury: "No threats, declarations, or acts of Joe Blain or Otho Askey, if such are in evidence, can be considered as evidence against the defendant, unless you first find from the other evidence before you that the killing resulted from an agreement between the defendant and the said Askey and Joe Blain; that such killing was the result of the common design and intent of all; and then only for what you may consider it worth, if anything, in explaining the acts of the parties at the time of the killing, if you find from the evidence that they agreed together to do the act."

*Fly & McNeal,* for appellant.—1. The court erred in excluding the expert testimony of Dr. G. W. McCaleb as to the position of the left arm of deceased when he was shot.

2. The court erred in permitting witnesses H. L. Kokernot, J. C. Dilworth, Earl Baldridge, and Colley Munford to testify as to the threats made by J. N. Blain long prior to the homicide, in the absence of defendant, and before any conspiracy was shown to have existed. Cox v. The State, 8 Texas Crim. App., 254; Harden v. The State, 4 Texas Crim. App., 356; Arnold v. The State, 9 Texas Crim. App., 439.

"The principle on which the acts and declarations of other conspirators, and acts done at different times, are admitted in evidence against the person prosecuted is that, by the act of conspiring together, the conspirators have jointly assumed to themselves as a body the attribute of individuality so far as regards the prosecution of the common design; thus rendering whatever is done or said in furtherance of that design a part of the res gestæ, and therefore the act of all; * * and here also, as in those cases, the evidence of what was said and done by the other conspirators must be limited to their acts and declarations made and done while the conspiracy was pending, and in

furtherance of the design; what was said or done by them before or afterwards not being within the principle of admissibility." 3 Greenl. on Ev., sec. 94; Phillips on Ev., 5 ed., 168; 1 Greenl. on Ev., sec. 111; Roscoe's Crim. Ev., 387.

"Further, the conspiracy being itself the predicate for the introduction of the acts, doings, declarations, and conduct of a conspirator, can not be shown by the acts, declarations, and conduct of a supposed conspirator, but must be proved aliunde. The conspiracy being shown by ordinary legal testimony, then, and not till then, can the declarations and conduct of a conspirator be admitted." Arnold v. The State, 9 Texas Crim. App.,439.

The language of these standard authorities and of our own courts lays down the principle, that a conspiracy between two or more persons having been proved, then the declarations of either of them made after the conspiracy is formed, in pursuance of the common design, is evidence against either of them. But in the case of Harris v. The State, 31 Texas Criminal Reports, 414, the writer of the opinion says that this old doctrine, made sacred by the wisdom of ages, "is now exploded." What vandal hand sprung the mine that exploded this old principle of law? Whose touch pressed the button that turned the electric spark on and shivered this safeguard thrown around the rights of the citizen? The opinion in the Harris case says it is done in Krebs' and Preston's cases, 8 Texas Criminal Appeals, 1, 35; in Pierson's case, 18 Texas Criminal Appeals, 556; in Thompson's case, 19 Criminal Appeals, 595; Cox's case, 8 Texas Criminal Appeals, 254; Smith's cases, 21 Texas Criminal Appeals, 102, 120; and Crook's case, 27 Texas Criminal Appeals, 240.

We shall briefly review these cases and endeavor to show that there is nothing in them to sustain the sweeping assertion that the doctrine "is now exploded" that the declaration of one person can not be used against another unless there is proof of a conspiracy, and that these declarations must be made in pursuance of the common design after the formation of the conspiracy and before its consummation. The Krebs case does not in any manner touch on this point; and in the Preston case the declarations of a codefendant were admitted after it had been shown that a conspiracy had already been formed between Krebs and Taylor, and of course when Preston came into the conspiracy he adopted the acts and declarations of his coconspirators. In the Cox case there is nothing that squints at the doctrine laid down in the Harris case, but that case is but an enunciation of the law of evidence, as old as English jurisprudence. The declarations were made after the initiation of the criminal enterprise. We commend the careful perusal of the Cox case to the court. In the Pierson case there is nothing that can be warped into the extreme position taken in the Harris case. The acts and declarations of Tom Pierson on the day

before the killing were admitted in evidence against Bob Pierson; and the court says, "Of course this evidence would not be admissible against the defendant unless a conspiracy was shown to exist between Tom Pierson and the defendant to commit murder, or unless it was shown that they acted together in the commission of it." In the Thompson case the declarations of Kennedy and Hendricks, coconspirators, were admitted, because the evidence showed that a conspiracy had been formed before the declarations had been made. In the Smith cases the conspiracy was proved and then all declarations of coconspirators were held admissible, and it was further shown that the fraudulent intent of each of the conspirators was known to the other. The writer of the opinion in the Harris case has, we think, totally misconceived the language of the court in the M. M. Smith case, 21 Texas Criminal Appeals, 120. Mark the language: "It is insisted that if any conspiracy is established between appellant and Bud Taylor, then that such conspiracy is not shown to have existed on the 3rd of July, and that any acts, declaration, or conduct of Taylor, in the absence of defendant, prior to the conspiracy, and not in furtherance thereof, can not be used as evidence against this defendant." And we are cited to the general rule as announced in Cox et al. v. The State, 8 Texas Criminal Appeals, 254, to the effect that the evidence of what was said and done by other conspirators must be limited to their acts and declarations done while the conspiracy was pending and in furtherance of the common design, "what was said by them before or afterwards not being within the principle of admissibility." This rule is unquestionably correct. The above language from the M. M. Smith case is the law of evidence, "rock-ribbed and ancient as the sun," and there is no change whatever made by the court. Immediately following the above language the court is laying down the rule not as to declarations made prior to the formation of a conspiracy, but as to the time during the course of the trial when the evidence of declarations can be heard, and while holding that declarations may be introduced before proof of conspiracy, yet they do it under the proviso that proof of conspiracy anterior to the making of declarations must be shown before the conclusion of the trial.

To show that our position is correct, we quote again from the decision: "The old rule, however, that a conspiracy must first be established ipso facto before proof by acts and declarations of the individual conspirators are admissible against each other, is now exploded." This does not mean, as the opinion in the Harris case holds, that it is unnecessary to prove a conspiracy in order to admit declarations of a coconspirator, but that the time of the admission of such proof during the trial is immaterial. Follow the Smith case further: "Ordinarily, when the acts and declarations of one coconspirator are offered in evidence against another coconspirator, the conspiracy should it-

self be first established prima facie and to the satisfaction of the judge trying the cause; but this can not always be required. It can not well be required where the proof depends upon a vast amount of circumstantial evidence—a vast number of isolated and independent facts. And in any case where such acts and declarations are introduced in evidence, and the whole of the evidence introduced on the trial, taken together, shows that a conspiracy actually exists, it will be considered immaterial whether the conspiracy was established before or after the introduction of such acts and declarations." Is not this language plain? And nowhere does the opinion say that it is "immaterial whether the fact of a conspiracy was established or not; the acts and declarations of every man who is present and acting as a principal at a homicide can be used against the other principals." It remained for the Harris case to do this. Again, Cook's case, 27 Texas Criminal Appeals, 240, is quoted to uphold the position taken in the Harris case, and there is not one word in that decision that holds to any such idea. We invite a careful perusal of that case. It sustains our position in every respect. After a diligent search we have been unable to find a single text book or decision in any court that goes to the extent of the Harris case, but it stands out in bold relief as the only one of its kind. It is sui generis. With one stroke of the pen it has overthrown precedent, trampled upon ancient rules, and utters a doctrine that is startling in its novelty, and subversive of one of the fundamental principles of law and morals, that a man can only be called in question for his own acts and the acts and declarations of others which he has adopted and made his own. We are aware of the fact that we are contending for appellant's rights on a technical ground, and we appreciate the fact that we are living in an iconoclastic period, when creeds and customs are trodden under unhallowed feet, when constitutions are disregarded, and bills of rights are but whisperings of a dead past. Time-honored rules and doctrines are ruthlessly brushed aside to subserve the utilitarianism of the times, and reverence for precedence and custom have "gone glimmering through the dream of things that were; a school-boy's tale—the wonder of an hour." Newspapers and barbecue orators are denouncing the technicalities of the law and clamoring for courts and juries to set aside precedents that have been fostered and upheld by the wisdom of ages; and these clamors are making their impress on our legislation and judicial decisions. But these technicalities of the law are the very bulwarks of a people's liberty. There are no technicalities in Russia or China. The accusation is followed by swift, merciless punishment. We can not afford to leave the well-beaten paths of our fathers and go out in quest of substantial justice, regardless of law, rule, or precedent. We can not afford to place the dynamite of change beneath the superstructure of legal wisdom left us by our fathers and explode its grand truths. We

can not believe that this court will adhere to the doctrine laid down in the Harris case.

We ask the attention of the court to the other assignments of error without further presentation, and pray for a reversal of the case.

*Atkinson & Abernathy,* of counsel for the State.—1. There was no error in the court excluding the testimony of Dr. McCaleb as to the position of the left arm of deceased, G. C. Barber, at the time he was shot. Such testimony would have been the mere conclusion of the witness as an individual and not as an expert, and involved matter upon which the jury were as competent to form an opinion from the facts and circumstances detailed as was the witness. Cooper v. The State, 23 Texas, 331; Steagald v. The State, 24 Texas Crim. App., 213, and authorities cited.

2. The court did not err in permitting the witnesses H. L. Koker-not and others to testify as to the threats made by the coconspirator J. N. Blain against the life of G. C. Barber. They may be considered as isolated and independent facts, tending to throw light upon the motive of defendant in being present at the time and place of killing, and acts and declarations immediately preceding and at the time of such killing, as well as the motive and intent actuating the coconspirator J. N. Blain at the time of the killing, and it was the province of the jury, under proper instructions of the court, to determine the weight of this testimony as going to establish whether or not such conspiracy existed.

We desire that the court should particularly note that the first threat proven to have been made by Joe Blain against the deceased, when he said, referring to deceased, that he was going to kill the d—d long-nosed Yankee son-of-a-bitch, was in the presence of defendant, and antedated the other threats in evidence by at least a year; and that the defendant had also threatened, more than a year before the killing, that he and John Blain would do deceased up, or that they ought to do him up.

In Cox et al. v. The State the court say: "To our minds, a great deal of the trouble, confusion, and discussion with regard to conspiracy, where two or more are charged with the commission of a crime, might and can be obviated by keeping in mind these statutory provisions. (Criminal Code, articles 74, 75.) If the parties can be identified at the time and place as joint participants in the commission of the crime, why the necessity of going behind the fact to establish a conspiracy to do the act already accomplished, and for which the law denounces them as principal offenders, and liable to punishment as such? Why want a better predicate or any further evidence even of a conspiracy, if their presence and guilty participation is already established? To us it seems too plain to admit of argument, that when two or more are found acting together with an unlawful in-

tent in the commission of an offense, the common design and acting together makes them ipso facto conspirators—endows them as a body with the attribute of individuality, merges the conspiracy to do the act in the act itself; and that the previous acts and declarations of each or any such principal offenders in pursuance of the agreed plan, and tending to throw light upon it, or the motive or intent with which it was committed, is and should be received as legal and admissible evidence against each and all, whether indicted, prosecuted, and tried jointly or separately.   *   *   *   This rule in no wise conflicts with the doctrine enunciated in Burrell v. The State,   *   *   *   because the ruling in each of those cases, excluding the declarations, was based upon the ground that there were no such proofs of complicity as would warrant the declarations of one party against the other." 8 Texas Crim. App., 302, 303.   The same can be said of Arnold's case, 9 Texas Criminal Appeals, 439, quoted in appellant's brief.   In that case the defendant was indicted and convicted as an accomplice; was at home, six or eight miles from the scene of the killing, at the time it took place; was never present when any threats were made by his code-fendants; and there was absolutely no evidence of any guilty complicity on his part in the killing, or proof of any preparation for the killing made by him.

"Any person who advises or agrees to the commission of an offense, and who is present when the same is committed, is a principal thereto, whether he aids or not in the illegal act." Penal Code, art. 78.   The defendant was present at the killing but took no part therein, except that (leaving out his confession that he drew his pistol half out) after Barber had fallen he ran up to him and put his foot on the gun.   In order, therefore, to convict defendant it became necessary for the State to show the motive and intent actuating Joe Blain in the killing of Barber.   If upon express malice, and defendant knew of this malice, and so knowing contrived, induced, advised, or agreed to the killing, then his being present constituted him a principal offender, and the motive and intent of Joe Blain became fully attributable to him.   If the killing was upon the implied malice of Joe Blain, and defendant so contrived, induced, advised, or agreed thereto, he was guilty of murder in the second degree.

The proof of but the one threat against deceased, made more than a year before the killing, might have been rightfully considered by the jury as but the ebullition of some passing passion, to be totally disregarded as tending to show former grudges, antecedent menaces, a sedate mind, or formed purpose in the killing.   It was therefore proper to show, it having been already in proof that defendant knew of the state of Joe Blain's mind toward deceased, that his threat was not a mere idle threat, passing from his mind like the passing of a summer cloud, temporarily obscuring the innocence of his thoughts, and to prove by

repeated threats, made at different times and places, to different persons, that malice towards Barber was rankling in his mind; that he was "nursing his wrath to keep it warm;" that instead of its being an evanescent whim, this desire for the life of Barber grew and lowered like the cloud "no bigger than a man's hand," which tokens the coming storm that consummates its wrath by bursting upon a helpless, defenseless world, leaving wreck and revolution, death and disaster, in its track; that the killing was the end and aim of that

> "—— patient search and vigil long
> Of him who treasures up a wrong,"

real or imaginary.

Our apology to the court for dragging them through such a lengthy mire of facts is, that the learned counsel who prepared the brief for appellant has seen fit to entirely ignore the evidence; that, mounted on the winged steed of his imagination, although surrounded by a cloud of witnesses, he has thrown aside every weight of fact that might incumber his flight or impede his progress, and flown into the realm of pure fancy and mixed metaphor; that although a mighty effort, his brief is a misfit, and better suited to the methods of the barbecue orator and the tastes of the rabble than to the dignified counsel addressing the court of last resort, whose duty and desire it is to patiently and impartially examine the record, and, from the law as applied to the record made, arrive at a just and righteous conclusion.

No sane person will deny that the facts proven of the acts and declarations of defendant and his codefendant at and immediately preceding the killing evidence a conspiracy or agreement on their part to do something in connection with Clark Barber. Askey raised a row with Barber and left him, avowing that he would produce the author of the accusation against Barber; he sought defendant, and they together sought Joe Blain; they separated, went and armed themselves; they met, consulted, and separated again, going by different but convergent routes to where Barber was known to be, unarmed and in his shirt sleeves; Askey and defendant (Askey being the spokesman) asked a private audience with deceased, their manner being such that Barber was advised to arm himself; Barber tried to get the gun, not to shoot Joe Blain, as he had no difficulty with him then, but to be on equal footing with those demanding the audience; Joe Blain, drawing his pistol, cocking and presenting it at Barber, followed him up before Barber had done or said anything else than to show a willingness to have a private talk with defendant and Askey on equal terms. Barber, we submit, had as much right to get the gun as Joe Blain did to have the pistol; and the drawing of the pistol and presenting it at Barber was a felonious assault on the part of Blain that Barber had the right to repel and to take Blain's life in doing; and that all that was needed to

make the defendant as guilty as Joe Blain was to show his knowledge of Joe Blain's motive and intent, and his guilty acquiescence therein, which we further submit the evidence amply shows.

But counsel for appellant has, with the enthusiasm for the public welfare of a Don Quixote, and with equal clearness of perception, set his lance at rest and spurred his Rosinante into dire conflict with the decision of this court in the case of Harris v. The State, 31 Texas Criminal Reports, 414, and we may add, with similar result. We will not attempt to rush to the defense of that opinion, as it needs none at our hands. The law is there more succinctly and satisfactorily stated than we could possibly do. But we will say that the court had already practically settled the issues in that case in this on the former appeal (30 Texas Criminal Appeals, 702) by ignoring them in their opinion in the case, although they were presented to the court by bills of exceptions, assignments of errors, and in the brief and oral argument of counsel for appellant.

*R. L. Henry,* Assistant Attorney-General, also for the State.

After the affirmance of the judgment, as shown by the opinion below, Messrs. Burgess & Hopkins filed an elaborate and interesting motion and argument for a rehearing, which was overruled by the court on April 26th without a written opinion.

SIMKINS, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at five years in the penitentiary.

1. The appellant complains that the court erred in excluding the testimony of Dr. McCaleb as to his expert opinion of the position of the arm of the deceased at the time of receiving the fatal shot. There was no error. This question has been several times passed upon by the courts of this State. Williams' case, 30 Texas Crim. App., 447; Cooper's case, 23 Texas, 331; Coyle's case, 31 Texas Crim. Rep., 607; Thompson's case, 30 Texas Crim. App., 328; 8 Crim. Law Mag., 148.

2. Appellant complains that the court erred in admitting evidence of threats made by Joe Blain against deceased before the conspiracy was formed, and in appellant's absence.

First. It is settled law that a conspiracy can not be proven, nor can any one be connected with a conspiracy, by the declarations or acts of another made or done in his absence. Outside of such acts and declarations there must be proof of the conspiracy itself, and then, to be admissible, the acts and declarations must relate to and be in furtherance of the common design, and be made during the existence of the conspiracy. But when the evidence makes a prima facie case of a conspiracy, then the jury can look to such declarations and acts

as are admissible, to ascertain the existence of the common design and relations of the parties to the conspiracy. Spies' case, 122 Ill., 102.

The necessity for a strict application of these rules is obvious in all cases where the charge is for conspiracy as a substantive crime (Penal Code, arts. 800–805), or where the existence of the conspiracy is the question at issue. But in cases where the conspiracy is shown beyond question by the parties being present and acting together, the rules have not the same force, as the question is as to complicity in the crime itself rather than in the conspiracy that led to it.

Now, even in cases where the conspiracy is the issue, *the time* when the conspiracy was first formed is frequently a question of fact that must be left to the jury, under proper instructions, and the rule would not be more rigid in cases where the conspiracy was not a question. In the case at bar it does not appear that the acts and declarations complained of did in fact transpire before the conspiracy was formed, but, on the contrary, the facts of the case justified their submission to the jury.

The statement of facts shows, that Barber was killed by Joe Blain on August 31, 1891. That some two years before his death there was much animosity existing on the part of the Blains against Barber, caused by his taking part against the Blains in a criminal prosecution in which Joe Blain was sent to the penitentiary. In January, 1889, Joe Blain declared, in the presence of appellant, that he was going to kill the d—n long-nose Yankee son-of-a-bitch. In January, 1890, while Joe Blain was in the penitentiary, appellant stated that he and John Blain would do up Barber if they ever got a chance. Some two months after his return from the penitentiary Joe Blain and Barber had a personal difficulty, in which he cut Barber with a knife, and subsequently made repeated threats to kill Barber, stating he would be fixed for him and have his witnesses there; that he would rather have good witnesses than good lawyers, and would go back to the penitentiary, and tried to induce parties to go on his bond in view of the prospective homicide. The fact that Joe Blain stated that he himself intended to kill Barber does not militate against the theory of conspiracy, for it was the threat actually carried out with the concurrence and presence of appellant. The Blains were brothers. It seems all they wanted in this matter was the opportunity. This was supplied by Askey. He met Barber at a saloon on the evening of the homicide and charged him with having threatened to whip him, Askey. Barber replied that his informant was a liar. Askey went off to bring his informant, and was shortly after seen talking with appellant, who called Joe Blain to them, and after an interview of a few moments they separated, armed themselves, and repaired to the saloon where Barber was. We think there is evidence in the record from which the jury might find that the design to

kill Barber had been agreed upon by the Blains long before it was accomplished, and that the threats were made during the conspiracy.

Second. It is to be observed that the reason for requiring proof of the existence of the conspiracy aliunde the acts and declarations of the coconspirators made in the absence of appellant is to prevent the danger of the jury finding the conspiracy to exist from the acts and declarations alone. In those cases, therefore, where the existence of the conspiracy is not an issue, because it is merged in the crime, and manifest from the parties being present and acting together in the commission of the crime (Cox's case, 8 Texas Criminal Appeals, 303), or where the proof aliunde establishing the conspiracy is so clear and conclusive as to negative the probability that the jury could have relied on such acts and declarations in finding a conspiracy, then their admission only seems to throw light on the conduct and motive of the parties acting together. If, therefore, in such cases, acts and declarations transpiring before the formation of the conspiracy are admitted, still, if they relate to and are in the furtherance of the identical purpose actually carried out, their admission can seldom be otherwise than harmless; especially where, as in this case, the court charged the jury that no threats of Joe Blain or Askey could be evidence against appellant, unless they find from other evidence that there was an agreement between them and appellant to kill Barber, and then only for what it was worth in explaining the acts of the parties at the time of the killing. The Penal Code (article 74) declares, that when parties are shown to be acting together at the same place and time in the commission of crime, they are principals; and where one agrees to or advises the commission of an offense, and is present when it is committed, he is a principal, whether he aids or not. Id., art. 78. It is true that mere presence at the commission of the offense may not constitute a principal. His presence may be the result of accident, curiosity, or to carry out a purpose different from that consummated; yet if he agrees to the act, incites or encourages it, and is present at its commission, he becomes a principal. This agreement may be shown directly or by circumstances, such as his companionship with the principal actor, his knowledge of his purpose, and his own conduct before, at, and after the commission of the crime. Burrell's case, 18 Texas, 732; Willson's Crim. Stats., sec. 147.

As we understand the record, the evidence of a conspiracy is clear in this case. Appellant was present. He came into the saloon with Askey and Joe Blain. They all came armed and called on Barber to come into the back yard. Did appellant agree to the commission of the homicide? That, as to him, was the factum probandum upon the proof of which his conviction must rest. To implicate him he must have been aware of the purpose of his companion. The evidence shows that Askey, leaving Barber in the saloon, met appellant on the

street, near a bank building, both in their shirt sleeves. They were shortly after joined by Joe Blain, and were earnestly talking together. Finding themselves observed from the bank, they separated, Joe Blain telling them to go to the place where Barber was, and he would get his pistol and come there and kill him. Joe Blain rode away to get a pistol, and appellant and Askey shortly after went into a store with coats on, and rented two pistols, promising to return them that evening or the next day, or pay for them. Thus armed they went to the place of the homicide, where they met Joe Blain. They first tried to induce Barber to meet them in the back yard, where Joe Blain perhaps had the "good witnesses" he had prepared for the occasion; but deceased, declining to go out unarmed, attempted to get hold of a Winchester in the room, and was shot down by Joe Blain, Askey and appellant standing by. Deceased, as he was lying on the floor, attempted to raise his gun, when appellant stepped forward and placed his foot upon it. We think these facts clearly show that appellant and his coconspirators were all acting together in the preparation for the murder of Barber, which, upon the same evening, was continuously carried into effect; and appellant was not only ready to assist, but did in fact assist, in the crime, and thereby became a principal. If appellant was a principal, no prior threats can add force to the facts of deliberate preparation for and execution of the formed design.

3. But there is another ground upon which Joe Blain's threats would be admissible. It is the theory of the defense that Joe Blain and his companions were seeking Barber only to confront him in his denial of the Askey charge, and for no other purpose, and Joe Blain was forced to kill him in self-defense. If this be true, appellant is not guilty. The intent of Joe Blain then becomes most important. In this point of view the threats and declarations of Joe Blain, constantly made during the months before and up to the morning of the homicide, become at once admissible as showing a deep-seated purpose to kill Barber, existing not only during the conspiracy but long before, and they would be cogent evidence to rebut the theory that the design to kill was suddenly formed, and that Blain acted in self-defense. Especially would they be admissible in a case like this, where, outside of his own confessions, the frequency of the threats of Joe Blain, coupled with personal violence to the deceased, the companionship and relationship of appellant to Joe Blain, and his own threats and conduct are such as would authorize a jury to infer that appellant had full notice of Joe Blain's purpose before a conspiracy was formed, or appellant had agreed to assist in carrying out said purpose. We therefore hold that the court did not err in admitting the declarations of Joe Blain: first, because it did not appear that they were in fact made before the conspiracy was formed; second, because their admission, if erroneous, would be harmless, appellant being shown by the evidence to be a

principal; third, because admissible to rebut the theory of sudden killing in self-defense, and show the actual purpose of Joe Blain, in which, by other evidence, appellant is shown to have concurred.

In the Harris case, 31 Texas Criminal Reports, 414, criticised, but misapprehended, by appellant's counsel, we considered a similar objection to that urged here. The question of conspiracy vel non was not involved in the case. It was conceded. There could be no denial of the fact that deceased was taken out in the night and hanged by a mob. The question in the case was whether defendant Harris was one of the mob. The objection was, the court admitted the acts and declarations of one of the conspirators occurring before the formation of the conspiracy. We replied, that as the courts did not adhere to the old order of introducing proof, to wit, of requiring the conspiracy to be first established before introducing acts and declarations of coconspirators, and because the time when the conspiracy was first formed was frequently a disputed question, it often became impossible for the court to draw a precise line for the admission or exclusion of testimony of that character, and such testimony would seldom reverse a case where the jury was properly instructed to disregard all acts and declarations of coconspirators occurring in appellant's absence, and not during the existence of the conspiracy. But we further held, that where one originates a criminal purpose, and induces another to assist in its execution, knowing and concurring therein, and this guilty knowledge and concurrence is shown by evidence aliunde, then the acts and declarations of the principal can be shown in evidence to prove the guilty purpose, though occurring anterior to the conspiracy. Smith's case, 21 Texas Crim. App., 102. It seems to be settled everywhere, that one who enters into a conspiracy already formed between two or more becomes responsible for every relevant act and statement of each conspirator transpiring before he entered into the conspiracy, though he in fact was ignorant of them. Krebs' case, 8 Texas Crim. App., 1; Smith's case, 21 Texas Crim. App., 96; 1 Greenl. on Ev., sec. 111. It is certainly difficult to see the force of the reasoning that would make one responsible for the words and conduct of two or more persons who, before his connection with them, had agreed to commit a crime, though he was in fact ignorant of such words and conduct, and yet not responsible for the acts and declarations of one originating the plan into which defendant knowingly entered and assisted in carrying out. The first rests on the technical reason of a conspiracy existing, and the law presumes knowledge and concurrence on the part of every coconspirator. The second would require guilty knowledge to be found as a fact by the jury. And so, in this case, the purpose of Joe Blain to murder Barber being shown, and appellant's complicity therein and presence at the homicide being also shown by evidence aliunde, we find

no cause for reversal. Nor do we think the other errors assigned present any reversible ground, and the judgment is therefore affirmed.

*Affirmed.*

Judges all present and concurring.