### IKE GODWIN v. THE STATE.

No. 1743.   Decided December 15, 1897.

**1. Murder—Motive—Threats Where No Person Was Named.**

It is always competent, as showing motive on the part of defendant, to prove threats made by him against deceased to take his life or do.him serious bodily harm, although he may not have mentioned the deceased by name, if it could be reasonably gathered that the deceased was meant or alluded to. But general threats by defendant not directed towards the person slain, or not of a character to embrace such person, are inadmissible.

**2. Same.**

On a trial for murder, where it appeared that the parties were friendly; that they entered into a game of cards, and that a sudden altercation ensued, evidently because deceased was winner in the game; Held, that general threats made by defendant on the previous day, that he would kill some d—d son of a b—h;" that "he felt like killing some one," not directed towards any particular person, were inadmissible, and were calculated to affect injuriously the rights of defendant and prejudice him before the jury.

**3. Same—Provoking Difficulty—Charge.**

Appellant is in no condition to complain that the court charged upon provoking a difficulty where it was shown that he was the aggressor and brought on the difficulty, nor is it any matter of defense for him to show, under such circumstances, that deceased engaged voluntarily with him in a rencounter with deadly weapons.

APPEAL from the District Court of Callahan.   Tried below before Hon. T. H. CONNER.

Appeal from a conviction for murder in the second degree; penalty assessed being twenty-five years imprisonment in the penitentiary.

Appellant was charged by indictment with the murder of Sam Campbell, by shooting him with a pistol, on the 10th day of August, 1897.

The case is briefly but sufficiently stated in the opinion.

[No briefs on file for appellant.]

*Mann Trice,* Assistant Attorney-General, for the State. .

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for twenty-five years; hence this appeal.

The homicide appears to have taken place over a game of cards. The game was made up between four young men some time in the morning of August 10, 1897. The names of the parties were Ike Godwin (the defendant), Sam Campbell (the deceased), Ned Merchant, and Eugene Irons. These parties retired to a place in the woods and played a game of freeze-out poker. The defendant put up his watch as his stake, the deceased a colt, Irons a pistol, and Merchant a horse. The stake of each was valued at $5. The pistol and watch were put on the blanket which was spread down for the game, and the horse and colt were not present. Matches were used for chips, each match being worth 50 cents. Irons was first "froze out," and then Merchant; and the game continued between defendant and deceased. Deceased, in the course of the game, won nearly all of the matches. A quarrel ensued, as one of the witnesses says, with reference to the deal. Defendant appears to have claimed the game, and grabbed up the watch, and also the pistol. On demand of the deceased he at length put down the pistol, but still held to the watch. According to the State's evidence the game then proceeded, and, after they played a while, the defendant made an effort to get the pistol again. Sam Campbell (deceased) reached for it, and got it. Defendant then said to Campbell: "Come with me. I want to tell you something." They both walked out some little distance from the blanket, where they were playing, deceased carrying the pistol in his hand, and stopped facing each other. According to defendant's evidence, just before the homicide Sam Campbell had most of the matches, and he claimed the watch, and told defendant to give it to him. Defendant replied, "You have got your part." Defendant then said: "Come out here. I want to tell you something." Campbell said, "All right, if you will give me a show." Defendant replied, "All right, I will do that." The State's witness to the homicide (Irons) said that the parties stood there, and quarreled awhile, and defendant shot deceased three times. "The pistol held by Godwin was pointed towards Campbell when fired. The first shot hit him in the breast; the second in the body, lower down; and the third in the forehead. As soon as the first shot was fired, Campbell began to fall. The second shot was fired, and struck him about the stomach, as he was falling. He fell on his back, and after he fell defendant then walked up to his side, and pointed his pistol, and shot Campbell in the forehead. All three

shots were fired close together. His forehead was powder-burned." This witness states that during the game Campbell sportively reached and got the pistol which had been staked on the game, and fired it at a bottle in his rear; that three shots were fired by defendant at the time of the homicide; that he (witness) then ran home, some one-fourth of a mile, and about the time he reached home he heard a fourth shot. The defendant's witness Merchant states: "That he went to where the parties were confronting each other and quarreling, and caught hold of defendant, and said, 'This will not do.' Defendant said, 'Stand back,' or he would shoot me. That he then stepped back; and Campbell at this time had his pistol cocked in his hand, near his hip. That he raised it, and pointed it towards defendant, before defendant made any demonstration to use his pistol. That Campbell raised his pistol, and pointed it at the defendant, who knocked it to one side with his right hand, and shot Campbell with his left. That when defendant knocked Campbell's pistol aside it was discharged, and this was the first shot fired; and Godwin then fired two shots in quick succession. Campbell fell upon his back, and after he fell Godwin took a step towards Campbell, and shot him in the forehead. This was the last shot fired, which was about a minute after the other two shots. That Campbell was dead when defendant fired the third shot into his forehead." Other testimony on the part of the State tended to show that the pistol which the deceased had was fired only once, which is accounted for by the shot at the bottle during the game of cards. The testimony also tends to show that there were four distinct shots in the body of deceased; besides those already mentioned, another being through the fleshy part of the deceased's arm, between the elbow and shoulder. After the homicide, defendant fled, and was not apprehended until some three or four weeks subsequent. These are substantially the facts attending the homicide, and have been stated in order that the questions of law may be properly discussed.

On the trial the court admitted testimony offered by the State, showing that on the day and night preceding the homicide defendant had made a number of threats of a general character; that is, not directed towards any particular person. We quote from the bill of exceptions, which was reserved to the admission of this testimony, some of said threats, in order to show their general character: "Hayden Williams testified that he saw defendant in the town of Baird, in Callahan County, about 11 o'clock the night before the killing. That defendant was drinking, but appeared to know what he was talking about. He took me to a rock pile out in front of Maxwell's saloon, where he had his clothes hid, and took off the rocks, and uncovered his clothes, which were in a seamless sack. He got on his horse, and asked me to hand him his sack of clothes. I did so, and he tied them on behind his saddle, and I went on back to Brown Seay's saloon with him, and we stopped in front of Seay's saloon. He said he was going to leave the country, but was going to kill some damn son of a bitch before he left. Said he was going to kill as good a friend as he had, and go to Devil's River and come back to court. He had his six-shooter

in his hand, and struck witness on the shoulder with it, and remarked for me not to be afraid; that he was not going to shoot anybody right here. I told him to put up his pistol; that he might hurt somebody. He replied that he knew how to handle a gun as well as any man, and was not going to hurt anybody right here." Ida Daniels testified that she saw defendant about 11 o'clock on the night before the killing, and that she heard him say he was going to kill somebody. The State also proved by witness N. P. Scruggs that he saw defendant early in the night before the killing, and he said he wanted to kill some son of a bitch; that he felt like killing somebody; and wanted to know if Scruggs ever felt that way. In none of these conversations was the name of the deceased mentioned or alluded to. The defendant reserved his bill of exceptions to all of this testimony on the ground that said threats were not pertinent or relevant; that they were not shown to have in any manner referred to deceased, and related to independent and extraneous transactions and occurrences not connected with the homicide, and not in any way pertinent to the issues in the case. It is always competent, as showing motive on the part of the defendant, to prove threats made by him against deceased; and the cases hold that, although the name of the deceased may not have been mentioned by the defendant, yet, if it can be reasonably gathered that the deceased was meant or alluded to, that threats to take his life or do him serious bodily injury are admissible. See Sparks v. Com., 89 Ky., 644, 20 S. W. Rep., 167; State v. King (Mont.), 24 Pac. Rep., 265. Some of the cases hold that general threats not directed to the deceased, made by defendant, are admissible as showing evidence of general malice and purpose to injure or kill some one. See Brooks v. Com. (Ky.), 37 S. W. Rep., 1043. Said case cites a number of authorities bearing out this proposition, but we have not had access to all the reports. The cases of Sparks and King, supra, do not support the proposition, but it was held in each of said cases, as stated, that the testimony showed that the threats of the defendant had reference to the deceased.

Whitaker v. Commonwealth (Ky.), 17 Southwestern Reporter, 358, would seem to support the contention. The court, however, say that: "If this testimony was incompetent, yet its admission would not authorize a reversal, because the accused, through the sympathy of the jury, was only found guilty of manslaughter."

Hopkins v. Commonwealth, 50 Pennsylvania State, 9, is another case referred to. In that case it does not appear that there was any quarrel or altercation, at the time of the homicide, between the defendant and deceased. The killing appears to have occurred on shipboard, where the defendant and a number of other persons were gathered. The defendant, without any cause assigned, threw a cup of coffee at a negro, missing him, and striking a marine. A contest then ensued between a number of parties standing on the starboard side of the vessel; and in the contest which ensued defendant stabbed one Andrew McMarity in the neck, inflicting a wound from which he died. Testimony was admitted on behalf of the State that the prisoner, some fifteen minutes before the occurrence, de-

clared that he would kill somebody before twenty-four hours. The court, upon this point, uses this language: "To get at the state of the prisoner's mind, and to show that he harbored revengeful and murderous passions, it was competent to prove his threats at or about the time of dealing the deadly blow. It was part of the res gestae. 'Upon an inquiry,' says Mr. Greenleaf (volume 1, section 108), 'as to the state of mind, sentiments, or disposition of a person at any particular period, his declarations and conversations are admissible. They are parts of the res gestae.' A drunken brawl between marines and sailors prevailed on shipboard. The prisoner's conduct had been so violent that he had been in irons several hours the day of the killing, and when released, his turbulent and quarrelsome conduct was resumed. Less than an hour before the mortal stab was given to McMarity, the prisoner declared that he would kill somebody before twenty-four hours. 'He hallooed it all around the deck,' says a witness. Now, it was of material consequence that the Commonwealth, who sought to convict the prisoner of murder in the first degree, should give evidence of a premeditated purpose—a formed design—to kill or to do some great bodily harm, for without malice prepense there could be no conviction of the higher grade of murder. Nor was it necessary that the premeditated malice should have selected its victim. If the jury believed that the prisoner had formed the deliberate design to kill somebody, and in pursuance of that purpose, within an hour after declaring it, did kill McMarity, the commonwealth had a right to insist upon his conviction of murder in the first degree, and that they might thus insist they had a right to prove his declaration an hour before the deed. Blackstone ranks 'antecedent menaces' and 'former grudges' as evidence of malice prepense; and he tells us, moreover, that malice prepense is not so properly spite or malevolence to the deceased in particular as any evil design in general, the dictate of a wicked, depraved, and malignant heart. The witness said he heard no threats against McMarity, but this made his testimony none the less admissible, for killing anybody in pursuance of the malicious purpose which the general threat evidenced was murder. We conclude, therefore, that there was no error in admitting the evidence contained in the only bill that was sealed." Now it would appear from this case that the court regarded this declaration as res gestae, and so admissible; or that it was admissible as showing evidence of general malice, and, though the deceased was not singled out, he was within the scope of appellant's malice. And it is believed that all of the authorities that support the proposition that general threats (not pointing to the deceased) are admissible are cases where the threats are evidence of general malignity, and the subsequent killing was embraced within the scope of such malignity. For instance, we have no doubt that, if a person declares that he intends to go upon the street, and kill some person, and straightway goes upon the street, armed with a weapon, and slays an individual, evidence of the previous declaration made would be admissible, both as a part of the res gestae and as showing a malignant disposition towards all persons, which would embrace the person slain. We hold

the rule to be that evidence of general threats made by the defendant on trial for murder, when such threats are not shown to have been directed towards the person slain, or to embrace such person, are inadmissible. In State v. Crabtree (Mo. Sup.), 20 Southwestern Reporter, 7, it was held that general threats made by the defendant on trial for murder some time before the killing were inadmissible in evidence when defendant and deceased are shown to have been on friendly terms until the day of the homicide. And see Strange v. State (decided at present term), ante, p. 280.

Now, in the case at bar, it can not be pretended that the threats of the defendant, made on the night before, were directed towards the deceased. The evidence does not suggest this remotely. On the day of the homicide they appear to have entered into a friendly game of cards, and a sudden altercation ensued, in which defendant slew deceased. The motive therefor was occasioned on account of a difference in regard to the game of cards. Evidently appellant became incensed at deceased because he was winner in the game. We can not say what effect this illegal testimony may have had upon the jury. Undoubtedly, it was calculated to make them believe that defendant was a dangerous and bad man. It may be that appellant deserved all the punishment he received, and even more, under the facts and circumstances of this case; but the fact that the illegal testimony was admitted, and that this may have operated to the prejudice of the defendant, requires a reversal of this case.

Appellant complains that the court gave a charge on provoking the difficulty. This is pointed out in the motion for a new trial. According to the testimony of both the State's and the defendant's witnesses, the defendant was the aggressor, and brought on the difficulty; and it is no defense to him that deceased may have engaged voluntarily with him in a rencounter in which deadly weapons were to be used. The charge of the court was rather liberal than otherwise to the defendant in this regard. But for the error of the court in admitting illegal and improper testimony of threats against defendant, the judgment is reversed, and the cause remanded.

　　　　　　　　　　　　　　　　　*Reversed and remanded.*