## Syl. Morton v. The State.

No. 2369. Decided March 5, 1902.

**1.—Murder—Opinion Evidence as to Position of the Parties.**

On a trial for murder, while it is not competent for a witness to give his opinion as to the relative positions of the parties at the time the fatal shot was fired, this rule is not violated where a physician, in describing the wounds upon deceased, illustrated the course of the bullets by placing the State's counsel and himself in position and pointing with his hand at the place of entrance and at an angle that would make the place of exit.

**2.—Same—Evidence—Threats Not Directed Against Deceased.**

On a trial for murder, it is not admissible to prove that on the night of the killing and at a place two or three miles distant therefrom, the witness heard three of four parties pass going in that direction, and heard one of them say, "G—d d—n him, I will kill him," it not being shown that defendant was one of the parties, and that he used the language, or that the threat was directed against deceased.

**3.—Exclusion of Illegal Evidence After It Has Been Admitted—Practice.**

Where evidence of an illegal and highly prejudicial character has gone to the jury without objection at the time by defendant, this does not estop or preclude defendant to have it excluded upon motion after the testimony is closed; and even during the argument of the case to the jury.

**4.—Murder—Opinion Evidence.**

On a trial for murder, it is not competent on the cross-examination of a witness to get illegal testimony before the jury by way of impeachment; and no testimony is more incompetent than the opinion of a witness which involves the guilt of the accused; as for instance, the witness can not be asked if he did not tell the grand jury that he thought defendant had killed deceased.

**5.—Murder—Charge as to Negligent Homicide.**

On a trial for murder, where the defendant denied all knowledge of the homicide, and had stated that he believed that deceased was shot accidentally by a stray bullet from a pistol fired by some one else, and there was no testimony to the effect that defendant shot deceased accidentally, the court properly refused to give an instruction on negligent homicide. Such a charge would have impinged on defendant's real defense, which was, that he did not fire the shot which killed deceased; and to have charged that he may have done so accidentally would have been a charge upon the weight of testimony.

Appeal from the District Court of Eastland. Tried below before Hon. N. R. Lindsey.

Appeal from a conviction of murder in the second degree; penalty, twenty-five years imprisonment in the penitentiary.

Appellant was charged by the indictment with murder of Ernest Thompson, on the 2d day of April, 1901, by shooting him with a gun and pistol.

Briefly stated, the evidence shows that a number of young men were returning on horseback, on a moonshining night, from a dance which they had attended, and were in a boisterous humor, galloping their horses and firing off their pistols. Some of the witnesses testified that six or seven of them were shooting at the same time, twenty-five or thirty shots being fired from a point opposite the house of Henry Pritchard, and the place where deceased fell from his horse. Deceased was shot on the left side of the head, the ball ranging a little forward,

the wound, according to the testimony of several witnesses, having been made by a bullet fired from a No. 38 or 41 caliber pistol. Some of the witnesses were also of the opinion that there were powder-burns on the face of deceased, made at the time he was shot. It was shown that at the time deceased was fatally shot there was no one near him except the defendant, Morton, and Dan Pritchard and Levi Cozart; that some of the other boys were several hundred yards in front, and some several hundred yards behind those four parties.

The statement of the defendant made before the coroner's inquest was put in evidence by the State, and was as follows: "I was at Mr. Jackson's at a dance on the night of April 1, 1901. I left there after the dance had broke, in a crowd of boys; among the crowd was Ernest Thompson. We had left the house and gone down the lane. After I had gone down the lane in a northern direction about 200 yards I saw Ernest Thompson leaning in his saddle, and after he rode this way about fifty or seventy-five yards he fell from his horse."

N. W. Broughton testified that he asked the defendant how Ernest got shot, and the defendant replied "that no one knew how he got shot; that it was bound to have been an accident shot or stray bullet." He said he then asked him who was riding with Ernest at the time he was shot, and the defendant replied, "No one was riding right with him; that he and Dan Prichard were riding about ten or fifteen feet behind him, and that his horse went about 75 yards after Ernest was shot."

Mr. Bennett testified that the defendant told him that he was with the crowd that Ernest Thompson was with, and was along near Ernest when he was shot; that he did not know who shot him, and did not know when he was shot, and that Ernest rode seventy or eighty yards after he was shot. He further stated that the defendant told him that he, defendant, and Ernest and Dan Prichard were together at the time he was shot, and that Mr. Beatty then asked him, defendant, where he was with reference to Ernest at the time Ernest was shot, and defendant said, "Rather behind, or along behind Thompson, and rather on the left hand side."

Dan Prichard testified: "As Levi Cozart, Syl. Morton, and Ernest Thompson and I rode up the lane opposite Prichard's house, Syl. Morton shot five or six times. After we all left the gate I was riding behind Syl. Morton and Ernest Thompson, and Cozart in front on the opposite side. We changed positions at Prichard's house. Cozart was in front and rode up a piece, and I rode up and took his place. I had been riding behind with Morton for a while. At the time I quit riding with Morton it was at a point fifteen or twenty yards from where the deceased fell from his horse. At the time I quit riding with Morton, Levi Cozart was about fifteen or twenty feet ahead of him, and Ernest Thompson was about ten feet behind me. After I left Morton I heard one or two guns fire, and a bullet whizz, and then looked back. I have always stated heretofore, when testifying about this, that I heard only one gun fire. I heard only one gun fire. When I heard the bullet whizz I ducked down

on my horse's neck, and then raised up and looked back. The shot appeared to be about twenty-five or thirty yards behind. From the time I heard the bullet whizz and looked back I had gone about ten feet. When I looked back Ernest Thompson was about five feet ahead of Syl. Morton. The last time before this when I saw Morton and deceased, the deceased was just behind Morton. When I was riding with Morton I was riding on his left side. When I looked back after I heard the bullet whizz, Morton was on the left hand side of the road. When I looked back after I heard the bullet whizz, Morton had his bridle reins in his left hand and his right hand was hanging down by the side of his horse. I could not see down as low as his right hand was. Defendant .was watching deceased. This happened immediately after I heard the pistol shot. When I looked back Morton's horse's head was about five feet from Ernest Thompson's body. It was a bright moonshiny night, and I could see anyone about 100 yards. When I heard the shot and looked around I did not see anyone down the lane, except deceased and defendant. I could see defendant and deceased plainly and tell who they were. I could see Levi Cozart about fifteen or twenty feet ahead of me going on down the lane. When I first looked back after I heard the shot, I saw Ernest Thompson leaning forward on his horse with one hand in his overcoat pocket, and the other holding the bridle reins. He fell in about a minute after I looked back; he went about fifteen or twenty feet and fell. After he fell his hand was still in his overcoat pocket."

*Scott & Brelsford, W. O. Morton,* and *W. P. McLean,* for appellant, filed an able brief and argument upon the insufficiency of the evidence.

*G. W. Goodson* and *Rob't A. John,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of twenty-five years, and prosecutes this appeal.

There is no merit in appellant's application for continuance. The Russells were evidently not at the dance on the night in question, as none of the witnesses saw them. Mrs. Clements was too remote from the scene of the homicide, and her testimony had no particular bearing on the question at issue. Nor was there any error in admitting the testimony of Dr. Croom, as explained by the court. This witness did not assume to state the position of the parties, but merely, in describing the wounds illustrated the course of the bullets by placing himself and State's counsel in the position stated in the bill of exceptions, and pointing with his hand at the place of entrance and at an angle that would make the place of exit. We do not understand this to be stating the course of the ball through deceased's head, or stating the position that the parties may have occupied in order for the ball to have made the entry and exit shown. As

set out in the bill itself, unexplained by the court, it was not competent for the witness to give his opinion as to the relative positions of the parties at the time the shot was fired. Cooper v. State, 23 Texas, 331; Blain v. State, 33 Texas Crim. Rep., 236; Hardin v. State, 40 Texas Crim. Rep., 209.

On the trial, the State introduced the testimony of J. M. Champion and Mrs. Champion, to the effect that on the night of the homicide, at a place two or three miles from Jackson's house, where the dance took place, she heard three or four men pass her house, who were cursing in a loud, vociferous manner, and were apparently drunk; and heard some one say, in a loud voice, "God damn him, I will kill him." It appears that this testimony was not objected to by appellant at the time it was introduced; and it further appears that appellant rebutted the same by testimony tending to show that neither appellant nor any of the parties who were with him used such language on their way to the dance at Jackson's. No motion was made to exclude this testimony after the introduction thereof, and before the argument began. During the argument of the last counsel for defendant, a formal motion in writing was presented, asking the court to exclude the evidence on the ground that it was not disclosed who made said statement, as testified to by the witnesses Champions; nor concerning whom the same was made, neither appellant nor deceased being identified in connection therewith. The court, in explaining his refusal to entertain the motion to exclude the testimony, put it on the ground that it came too late; that appellant, on the statement of his own counsel, knew at the time said testimony was introduced that it was not admissible; and, at the conclusion of the State's testimony, he then knew that the State had not shown the admissibility of the same by connecting appellant or deceased therewith,—the court basing his ruling, that it is not permissible for defendant or his counsel to experiment with the court about said testimony. In this connection it may also be stated that appellant prepared and presented to the judge a special charge instructing the jury not to regard said evidence as against appellant. There can be no controversy as to the inadmissibility of said evidence, it not being shown that the language was used by appellant or in his presence, and it not being shown that the same was directed against deceased. Godwin v. State, 38 Texas Crim. Rep., 466; Strange v. State, 38 Texas Crim. Rep., 280; Holley v. State, 39 Texas Crim. Rep., 301. The question is, did the objection come too late, so as to forfeit appellant's right to have it excluded? For in our opinion the testimony was unquestionably hurtful. It was admitted in the case, like other testimony, for the consideration of the jury, and they were liable to believe that the language used must refer to the defendant, and must have been a threat by him against deceased; because otherwise it had no business in the case. The general rule is, when illegal testimony is offered, that objection should then be interposed. It sometimes happens that evidence is offered which does not appear to be relevant at the time, but which is subsequently connected; but this connec-

tion must be made before the testimony closes. At this stage of the trial, if testimony has been introduced on the assurance of showing its relevancy before the conclusion of the evidence, and no connection then appears, a motion to exclude should be made. This course was not pursued. But does it follow that appellant waived his right of objection and was estopped during his argument to then ask the exclusion of the testimony? We think not. Graves v. State, 14 Texas Crim. App., 120; Burke v. State, 15 Texas Crim. App., 156; Rakes v. People, 2 Neb., 164. As was said in Burke's case, supra: "But, the illegal testimony not having been objected to at the time it was introduced, is the defendant thereby precluded from objecting to it by motion to exclude it? We think not. It is proper practice, where it can be done, to object to evidence when it is offered; but it is frequently the case that illegal evidence goes before the jury before any objection can be interposed to it. It has always been the practice in this State to entertain a motion to exclude incompetent testimony, though not objected to at the time it was offered and introduced." It is true that the objection in said case was made at the close of the testimony. But this is a recognition of the principle contended for by appellant here, and is based on the idea that a defendant ought not to be convicted on illegal testimony. Of course, the rule that illegal testimony should be objected to when offered is recognized as the correct rule of practice, yet, if the testimony is clearly inadmissible and is hurtful, it is the duty of the trial court to exclude it at any time during the argument, or even in the charge to the jury. As stated above, the testimony here introduced was illegal. It was injurious to appellant, inasmuch as they were liable to attribute the expression to defendant as made by him against deceased, and thus suggesting malice on his part against deceased. The court says he refused to exclude the testimony, because appellant's counsel appeared to be experimenting with the court. We see no evidence of this; and it may be that the forgetfulness or oversight of counsel caused him to overlook a timely motion to exclude it, and his attention was not recalled to the injurious effect of the same until the argument was made, and the testimony used against appellant before the jury to his prejudice. Capps v. State, 40 Texas Crim. Rep., 103. Levi Cozart was a witness for defendant. His testimony was material, as he was at the scene of the homicide and was favorable to appellant, especially as it traversed the testimony of Dan Pritchard, the most important witness for the State. On the cross-examination of this witness by the State, the following question was propounded to him: "Did you not tell the grand jury that you first thought deceased was killed by a stray bullet; but after going back and seeing the boy, seeing he was shot in the side of the head, and that the side of his face was powder-burned, and that from the position that you saw him and Morton in just before the time that he fell, that you then believed that Morton fired the shot into his head?" The witness answered, "I do not know." He was asked, "Do you not know you told the grand jury just exactly what I have stated to you? Did you not tell the grand jury that you thought that Morton

killed him?" To which the witness answered, "Yes, sir." This was objected to by appellant, on the ground that the question and answer involved the conclusion of the witness, and is irrelevant, immaterial, and prejudicial. The court, in explaining this bill, says that this witness had testified, at the instance of defendant, to facts and circumstances which, if true, showed it to have been impossible that defendant could have fired the shot or could have been in a position to have fired the shot that killed deceased; and that the testimony above stated was admitted as tending to show that his testimony on the trial was false. If appellant had stated any fact before the grand jury contradictory of or inconsistent with any fact stated by him on the trial, then unquestionably it would have been competent to have impeached him by inconsistent or contradictory statements. But it is never competent to get illegal testimony before the jury, by way of impeachment; and we can think of no testimony more irrelevant or incompetent than that of an opinion of a witness, especially when that opinion involves the guilt of the accused. The opinion of the witness would not have been admissible as original testimony, nor was it admissible as impeaching evidence. If said testimony was admissible for the purpose of impeachment, had witness denied that he made such statement before the grand jury, then one of the grand jurors could have been introduced to contradict him. This is not permitted. Drake v. State, 29 Texas Crim. App., 265; Cogdell v. State, ante, page 178; Wilson v. State, 37 Texas Crim. Rep., 64.

Appellant has assigned as error the action of the court charging upon express malice, and also failing to charge on negligent homicide. We think the charge on express malice was proper; and we are inclined to the opinion that the court was also authorized not to charge on negligent homicide. If appellant had avowed the homicide and claimed accident, of course such a charge would have been necessary; or if there was other testimony tending to show appellant may have shot him accidentally, such a charge may have been called for. But in this case he disavowed all knowledge of the homicide, stating, however, that he believed deceased was shot by some one else accidentally with a stray bullet. The court instructed the jury that if some one else did the shooting, and not defendant, to find him not guilty. If, under the circumstances, he had instructed the jury, if appellant accidentally shot deceased, to find him guilty of negligent homicide, then it would have impinged on appellant's real defense, that he did not fire the shot that killed deceased, and would have been, in our opinion, a suggestion on the part of the court that he may have done so accidentally, and so have been a charge on the weight of testimony.

For the reasons heretofore stated, the judgment is reversed and the cause remanded.

*Reversed and remanded.*