### HENRY HARDY v. THE STATE.

*No. 521. Decided November 19.*

1. **Practice—Bill of Exceptions—When Variant from Statement of Facts.**—When a bill of exceptions contradicts the statement of facts in any specified particular, the bill will be held to control and correctly state the disputed matter.

2. **Same — Qualification of Bill of Exceptions.**—Where the court qualifies or explains a bill of exceptions, such qualification or explanation will control the recitals in the bill, to the extent to which it modifies such recitals.

3. **Threats — Admissibility of.**—Where on a trial for murder the State proposed to prove by a witness that defendant had said of some party, whose name he did not call, " he has got my pistol, and if he don't give it up to me I propose to kill him," and afterward the evidence adduced connected the deceased as the party indicated by the threat, *held*, that the evidence was admissible. A threat need not name the party threatened, where the other facts proved give individuation to it.

4. **Improper Argument of Counsel.**—To require a reversal of a judgment on account of improper and unwarranted remarks made by the prosecuting attorney, such remarks and argument must not only be improper, but also of a material character, and such as under the circumstances attending the particular case were calculated to injuriously affect the defendant's rights before the jury.

5. **Practice where Court Submits Murder in Second Degree on Evidence Establishing Murder in First Degree.—**A conviction will not be set aside because the charge of the court and verdict of the jury are more favorable to the defendant than the testimony would justify. Following Fuller v. The State, 30 Texas Court of Appeals, 559.

6. **Accidental Homicide.**—See a state of facts where defendant's theory was held not to be sustained by the evidence.

APPEAL from the District Court of Fayette. Tried below before Hon. H. TEICHMUELLER.

On a trial under indictment for the murder of one Nathan Huff, appellant was convicted of murder in the second degree, with punishment affixed at seven years in the penitentiary, and from this judgment of conviction he prosecutes this appeal.

The theory of the defense was, that the killing was accidental. The defendant's testimony as to the occurrence was as follows:

My name is Henry Hardy.  I lived with Frank Kirk in May, 1891. On the 16th of May of that year I went to the town of Schulenburg, together with Mr. J. W. Beal, John Thomas, and Leuvenia.  After I reached town, and about an hour before sundown, I met deceased on the street.  He told me that my pistol was at his house, and that I could come up and get it.  This was said in an ordinary conversation.  We exchanged no angry words; we were not mad at each other; we were friends. The Mexican Leuvenia was present at the time this conversation took place between Huff and myself.  A short time after this I borrowed my brother-in-law's (Addie Nevells') horse to ride up to the house of Nathan Huff to get my pistol.  I told Mrs. Huff that I wanted to see Mr. Huff. She went back in the house, and Nathan Huff came out with my pistol (a double action bull dog) in his hand.  Huff handed me the pistol with the butt toward me.  I took it and asked him if he had any cartridges for it.  He said, no, his cartridges would not fit that pistol.  I took the pistol and was holding it in my hands looking at it, when the pistol went off.  At the time of the discharge of the pistol I was sitting with my right leg thrown across the neck of my horse and in front of the pommel of my saddle, and at the discharge my horse became frightened and jumped, my hat fell to the ground, the women began to scream, and I ran off up the street.  I went about three miles from town, where Addie Nevells lives, and tying his horse I started out on foot to Wharton County. I stayed in that county a few days, and went to Houston, where I got Will Robertson to write a letter to Mr. Frank Kirk, in which I told him to come after me, or send some money for me to come home.  I was finally arrested and brought to La Grange jail, where I remained until after the fall term of the grand jury, and went back and worked in the country, near Schulenburg, until I was arrested a few days ago.

Cross-examined:  I did not stop to see whether I had killed Nathan Huff or not.  After I had gotten from town I heard the bloodhounds after me, and I was afraid to return.  I don't know how come Nathan Huff in possession of my pistol; he did not get it from me.

A succinct summary of the testimony of the State showed that deceased had had possession of defendant's pistol for sometime.  How or when he got it, is not stated.  Jackson, a witness, stated that a week before the homicide, he heard the defendant say, "A son-of-a-bitch has got my pistol, and if he don't give it up, I propose to kill him."  Witness stated that they were not talking about deceased at the time, and that he did not know about whom he was speaking.

Peter Foster, testified:  That on the evening before the homicide he was standing on the street, at Schulenburg, with defendant, when defendant pointed out deceased, Nathan Huff, who was driving past on a dray, and said, "I propose to kill that damned son-of-a-bitch."

The witness Beale testified that he went to town the day Nathan Huff

was killed, in a hack with Jno. Thomas, a Mexican, and defendant, and that while on the road the defendant said, "I propose to kill a negro to-day."

America Huff, wife of deceased, said that about sunset the defendant rode up and asked for her husband. Said that he wanted to see him. That as her husband went through the front room he picked up a pistol, carried it in his hand out to the gate, where defendant was. They exchanged a few words, which she did not hear, when her husband, with the barrel of the pistol in his hand, handed it to the defendant, who took it, looked at it a moment, pointed it at and shot her husband in the face, just above the eye, killing him almost instantly.

Kroschell, another witness, said he saw Hardy when he shot Nathan Huff. He was sitting on his horse, at the time, "sorter" back in his saddle. Saw him take the pistol from Huff, look at it a minute or two, then throw it over towards deceased, and fire.

Both the above witnesses say that the defendant immediately put his horse into a run, not stopping to get his hat, which he had dropped at the time of the shooting.

Henry Eilers, marshal of Schulenburg, stated that defendant left the county immediately after Huff was killed. Had papers for him, but could not find him. Finally arrested him in the jail at Houston, sometime after the killing.

*M. M. Williams* and *W. S. Holman*, for appellant.—This case is one of murder in the first degree, or it is accidental homicide. If it is the former, then it was error for the court to charge on murder in the second degree, because it licensed the jury to find a verdict unauthorized by evidence, and militated against the theory of the defense—accidental homicide.

Had the court charged upon murder in the first degree alone, the defendant would probably have been acquitted.

While we have set out the previous assignments of errors to some length, still we are disposed to candidly admit to the court that it is upon this eighth assignment we rely for a reversal of this case.

The district attorney, in his closing argument to the jury, used the language as set out in bill of exception No. 2, which is as follows: "Gentlemen of the jury, I was in the grand jury room when the witness America Huff testified before the grand jury last fall, and I tell you, Messrs. Ledbetter and Hall are mistaken about her testimony. She testified the same then as now."

The court approved said bill of exception, with the following qualifications: "That the district attorney made the remarks complained of in reply to an argument by counsel for the defense, based upon the failure of the first grand jury to indict the defendant, and he explained their

failure by stating in addition that said first grand jury could not procure the attendance of certain witnesses, who appeared and testified before the subsequent grand jury.''

The argument of the district attorney is objected to upon four grounds, viz.:

1. That it improperly bolstered up the testimony of America Huff.

2. That it was an unauthorized impeachment of the witnesses Ledbetter and Hall.

3. That it assisted the State in making out her case against the defendant.

4. That it influenced the jury in finding their verdict. The evidence up to this time having been on an equipoise.

We submit that had the district attorney wanted the jury to consider his remembrance of America Huff's testimony before the grand jury in the fall of 1891, he should have been sworn, like other witnesses, and allowed his testimony to have been subjected to the same rules.

No brief on file for the State.

DAVIDSON, Judge.—Appellant was convicted of murder in the second degree, and his punishment assessed at a term of seven years in the State penitentiary.

By the witness Jackson the State proved, that defendant, one week before the homicide, using a very opprobrious epithet in reference to an unnamed person, said, ''He has got my pistol, and if he don't give it up to me I propose to kill him.'' This was objected to because it was not shown that defendant referred to deceased, or that deceased was in possession of the pistol. The court states in the bill of exceptions that he admitted the evidence upon the assurance of the district attorney that he would connect the testimony with the deceased, and that this was subsequently done. It is insisted by the appellant that the above statement of the court is not sustained by the statement of facts.

The rule in such cases is, that when a bill of exceptions contradicts the statement of facts in any specified particular, the bill will be held to contol and to correctly state the disputed matter. Gaines v. Salmon, 16 Texas, 311; Smith v. The State, 4 Texas Ct. App., 626; Harris v. The State, 1 Texas Ct. App., 74; Briscoe v. The State, 27 Texas Ct. App., 193.

It is equally true that the court's qualification or explanation of the bill of exceptions will control the recitals in the bill, in so far as such explanation modifies such recitals. The court's qualification shows the testimony to have been clearly admissible; not only so, but the evidence itself discloses that the defendant had been to the residence of deceased once or twice prior to the killing, in order to secure the return of his pistol, and had failed to get it. The threat need not name the party

threatened, where the other facts adduced give individuation to it, as was done in this case.    Whart. Crim. Ev., 9 ed., sec. 756.

Exceptions were reserved to the following remarks of the district attorney:  " Gentlemen of the jury, I was in the grand jury room when the witness America Huff testified before the grand jury last fall, and I tell you Mr. Ledbetter and Mr. Hall are mistaken about her testimony.  She testified the same as now."    The court qualifies the bill of exceptions by stating, " That the district attorney made the remarks complained of in reply to an argument by counsel for the defense, based upon the failure of the first grand jury to indict, and to explain their failure by stating, in addition, that said first grand jury could not procure the attendance of certain witnesses who appeared and testified before the subsequent grand jury."

The evidence discloses the fact to be, that the first grand jury having failed to secure the evidence of the witnesses, except America Huff, failed to indict the defendant.   On cross-examination, defendant's counsel asked the witness Huff if she did not state to the first grand jury that the defendant was sitting in his saddle, with his right foot thrown across his horse's neck, at the time he shot and killed the deceased.   She replied that she testified then as on this trial—that is, that he was sitting in his saddle with his feet in the stirrups.   Ledbetter and Hall, two members of the former grand jury, being introduced for that purpose, contradicted this witness as to her statement before that body as to the position of the defendant's right foot and leg at the time he shot and killed the deceased. The only point of difference between these witnesses as to Mrs. Huff's testimony before the grand jury, was in reference to the position in which she placed defendant's leg and foot at the time of the shooting.

The impropriety of the remarks of the district attorney being conceded, still we are unable to see how the same could have been of such a prejudicial character as to have affected the case on trial, or require a reversal of the judgment.   Neither of the impeaching witnesses attacked Huff's testimony as to the fact that the shooting by the defendant was intentional.   The remarks complained of must not only be improper, but must also be of a material character, and such as, under the circumstances attending the particular case, were calculated to injuriously affect the defendant's right before the jury.   Willson's Crim. Proc., sec. 2321.

It is also contended that the court erred in submitting to the jury the issue of murder in the second degree, because the evidence discloses the homicide to be murder in the first degree.   While the evidence would have justified a verdict of murder for the higher degree, yet there was testimony authorizing, if not demanding, the charge complained of.   We can not agree to defendant's proposition, that the conviction should be set aside, because the charge and verdict are more favorable to him than the testimony would justify.   Fuller v. The State, 30 Texas Ct. App., 559.

The jury did not err in discarding the defendant's theory of accidental homicide. The facts do not sustain it. Even his individual testimony does not sustain, but rather repels, such a conclusion. Touching this phase of the case, the defendant, in substance, states that he went to the house of deceased, called for and received his pistol from deceased, and when it was handed to him, and while looking at and revolving the cylinder for the purpose of ascertaining if the cartridges were of proper size, it went off and killed deceased. He immediately fled. Went three miles into the country, returned the horse he was riding, which he had borrowed to ride to the house of the deceased, and continued his flight to Wharton County, and thence to Harris County. He stated also that he did not know whether or not he had killed deceased at the time he fled. For the State, two witnesses swear positively to an intentional and deliberate killing by defendant, and to his immediate and rapid flight. He did not stop to see if he had killed deceased, nor did he indicate by act or word that the act was otherwise than deliberate.

The testimony fully sustains the conviction. Finding no reversible error in the record, the judgment is affirmed.

*Affirmed.*

Judges all present and concurring.