### E. A. HOLLEY v. THE STATE.

No. 1449. Decided May 18, 1898.

Motion for Rehearing Decided June 8, 1898.

1. **Murder—Evidence—Threats Where the Threatened Party Is Not Named.**

On a trial for murder, general threats not directed by name to the individual killed, and not shown by other testimony to have been directed towards him or having embraced him, are inadmissible as evidence. But such evidence, if improperly admitted, is not injurious to defendant where it does not tend to increase the punishment. [But see infra, paragraph 5.—Reporter.]

2. **Defendant as a Witness—Cross-Examination.**

Where a defendant takes the stand and make a voluntary witness of himself, he stands in the attitude of any other witness, and is subject to the same rigid rules of cross-examination.

ON REHEARING.

3. **Murder—Evidence—Threats Where Threatened Party Is Not Named—Burden of Proof.**

On a trial for murder, in order to render admissible as evidence the threats of the defendant, where threatened party is not named in the threat, if the threat is not one of general malignity which might embrace all persons, the burden of proof is upon the State to show that such threat was directed towards the person slain, or embraced such person. And such fact is not alone established by proof from which it might be inferred that defendant must have meant deceased because he killed him on the evening of the same day the threat was made.

4. **Same—Doubt as to, How Solved.**

Where the evidence leaves it in doubt as to whether threats by defendant which are sought to be introduced in evidence were directed against deceased, the doubt must be solved in favor of defendant and the evidence be excluded.

5. **Same—Self-Defense.**

Evidence of threats by defendant, which are not with reasonable certainty shown to have been directed towards deceased, and which are calculated to support and strengthen the State's theory of an unprovoked killing by defendant and so destroy his theory of self-defense supported alone by his (defendant's) testimony, is inadmissible, because evidently harmful and erroneous and calculated to prejudice his theory of self-defense.

6.  **Self-Defense—Evidence—Animus of Deceased—Acts and Declara-
       tions of.**

On a trial for murder, where the defense is self-defense, it is admissible to show that the deceased entertained unfriendly feelings towards defendant, and his very language conveying and giving color to his feeling and expressive of his animosity, is admissible in evidence.

APPEAL from the District Court of Gonzales. Tried below before Hon. M. KENNON.

Appeal from a conviction for murder in the second degree; penalty, five years imprisonment in the penitentiary.

The indictment charged appellant with the murder of Frank House, by shooting him with a pistol, in the county of Gonzales, on the 28th day of August, 1896.

The case is sufficiently stated in the opinion.

*Burgess & Hopkins* and *J. H. Bailey,* for appellant.—The court erred in allowing the State to prove by the witness Frank Ermis that he heard defendant at his store on the evening of the killing say, "I will kill the God damn son of a bitch and be in Mexico before morning," there being nothing to show in the words themselves or otherwise that the language had reference to the deceased House.

A threat by a defendant on trial for murder against the life of some one is not admissible unless it be shown by the threat itself or circumstances connected with it that the deceased was the person against whom such threat was uttered. Mathis v. State, 34 Texas Crim. Rep., 39; Hardy v. State, 31 Texas Crim. Rep., 289; Godwin v. State, 38 Texas Crim. Rep., 466; Whart. Crim. Ev., 9 ed., sec. 756.

The court erred in excluding the testimony offered for the defendant from his wife, that "Mr. House frequently upbraided me for not marrying his brother and for marrying my husband, the defendant, whom he said was a damn rascal; that he was a low down trifling scoundrel for whom he had no use or respect; that he hated him on account of his marrying me and taking my ducks to such a poor market; that if he got a chance he would make it hot for him, the little cur." Same being competent under the facts of the case to throw light on the acts of House at the time of the killing and those of the defendant, it all having been communicated to the defendant by his wife.

Where the question was raised as to who was the aggressor in the fatal difficulty, statements of the deceased showing his feeling and the cause and intensity of it are admissible.

When the defendant claims he acted in the killing in self-defense, the statements of the deceased as to his feelings toward defendant known to the defendant are admissible to throw light on the actions of both deceased and defendant at the time of the fatal difficulty. Sims v. State, 9 Texas Crim. App., 586; Russell v. State, 11 Texas Crim. App., 288; Howard v. State, 23 Texas Crim. App., 265; Ball v. State, 29 Texas Crim. App., 107.

The court violated the Constitutions of the United States and of this State, which provide that defendant shall not be compelled to give evidence against himself, in forcing him, over his objection, to admit that he had had incriminatory conversations with the State witnesses Bellamy and Wemkin, he not having testified as to any of those matters, and they being independent facts from the facts of the killing, about which he chose alone to testify.

A. N. Bellamy, for the State, had sworn that prior to the shooting he talked with defendant at the gin and defendant said, "I. see House is here." Witness said, "You will monkey round some big man and you will get the p—s stamped out of you." Defendant said, "I wish House would try this once; I would do him up." Wemkin had sworn that he had a conversation with defendant near the gin gate about five minutes prior to the shooting, in which defendant said, "I see House is here; I am going to whip him to-day."

The defendant took the stand for himself and testified only as to the immediate facts of the killing. On cross-examination the district attorney asked him if he did not have these conversations with Bellamy and Wemkin. Defendant objected, on the ground that he could not be forced under the Constitutions of the United States and this State to give evidence against himself by admitting independent incriminatory conversations. The objection was overruled, and he answered that he had the conversations—to which he excepted. U. S. Const., art 5; Texas Const., sec. 10.

After the opinion affirming the judgment had been handed down, the above attorneys also filed a most able argument, on motion for rehearing, which, owing to its length, the Reporter regrets that he can not reproduce.

*W. W. Walling* and *Mann Trice,* Assistant Attorney-General, for the State. [No briefs found with the record.]

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of five years; hence this appeal.

Appellant and deceased were brothers-in-law, and a state of unfriendly feeling had existed between them for a month prior to the killing. It appears that before defendant married his wife, who was a sister of the deceased's wife, she had been engaged to a brother of the deceased, and after her marriage with the defendant deceased entertained ill feeling towards him. About a month before the homicide appellant came to the house of deceased, and attempted to drive a cow out of the lot of the deceased to his (defendant's) own house.. The cow had previously been loaned to deceased's wife by her father. Appellant claimed that he had been authorized by J. F. Phillips, his father-in-law, to come and get the cow. When he first came after the cow the wife of the deceased inter-

fered with his driving the cow out of the lot, and in the meantime deceased came up and prevented appellant driving the cow away. At that time appellant started to draw a pistol on the deceased, remarking to Mrs. House, the wife of the deceased, that he would kill deceased some day when she was not present. The killing occurred at the gin of one Faranthold, situated in the neighborhood, between 4 and 5 o'clock in the evening. Deceased and Wemken were sitting in the gin house on a box, whittling with their pocket knives. It appears, however, from the State's testimony, that deceased at the time of the difficulty had closed his pocket knife and placed it in his pocket. Appellant approached the parties and stood in front of them, about ten or twelve feet, and said something which some of the witnesses did not understand. One witness, however, states that he struck himself in the breast or side, and said, "There is shucks here." Wemken remarked to him that somebody would whip him if he did not mind. Defendant replied, "Let them try it." Deceased thereupon got up, and asked if he meant him or had anything against him. Appellant said, "Yes," and pulled his pistol and shot, one shot taking effect in his breast and the other in his leg.

The theory of the State was that the homicide was, at least, murder in the second degree, and that of the defendant that it was a killing in self-defense. The State proved by three witnesses that deceased was sitting down in the gin talking to Wemken, and appellant approached them; that he made some remark, as stated above, to them, and deceased got up and started towards the defendant, and when he got to or near him deceased shot him down. All these witnesses concur in stating that deceased had no knife in his hand. These and other witnesses show that he had a knife closed in his pocket after he was killed. Appellant testified that he went into the gin room, where deceased and Wemken were sitting down whittling with their knives; that he walked up near them, and Wemken said to him, "Somebody is going to whip you to-day;" and appellant said, "Well, if anybody thinks they can whip me, just let them try." Then House sprang up with a knife in his hand, and said, "You son of a bitch, you meant that for me." Appellant said, "God damn you, if you want to take it that way." House came towards appellant, and he said, "Stop, damn you, or I will kill you." Then House grabbed defendant by his collar with his left hand, but he knocked his hand loose, sprang back, and fired, and House fell on his knees. The State proved by two witnesses threats made by defendant at the gin against the deceased on that evening, a very short time before the homicide. Bellamy states that "defendant approached him at the gin, and said, 'I see House is here;' and I said to defendant in the talk, 'You will monkey around some big man, and you will get the piss stamped out of you.' Then defendant said, 'I wish House would try this once; I would do him up.' " Wemken said that defendant had approached him a short time before the homicide, and remarked to him, "I see House is here;" to which witness replied, "Yes." Defendant said, "I am going to whip him." Witness

said, "Oh, no, you won't;" that he did not think the defendant meant what he said, as he appeared to be joking. This is substantially the testimony as to the killing.

On the trial the State was permitted to prove by the witness Frank Ermis that defendant came to his store, which was a few miles from the gin, on the evening of the killing, and called for his account; that he settled the same, and he heard the defendant say, "I will kill the God damn son of a bitch, and be in Mexico before morning;" that he did not know who defendant was talking to or about; that was all he heard; that defendant left shortly afterwards, and went the road leading towards his (defendant's) house, beyond the gin. Appellant objected to this testimony, because there was nothing in the remark to show that he had reference to the deceased; that the threat could only be admitted to show malice against House, and throw light on the defendant's action towards House, and defendant's subsequent action could not revert back to his threat, and color it, and make it admissible,. The objections were overruled, and the evidence admitted. We discussed the doctrine with reference to this character of testimony in Godwin v. State, 38 Texas Criminal Reports, 466, and we there laid down the rule, in accordance with the authorities, that general threats, not directed by name to the individual killed, and not shown by other testimony to have been directed towards him or having embraced him, were not admissible. It occurs to us, however, from the other testimony in this case, that, notwithstanding deceased was not named in connection with the threats, it can be reasonably inferred that the threats were directed against him. Appellant was shown to have had malice against him, and he is not shown to have entertained hostile feelings towards any other person in the community. It appears that he went straightway from the place where these threats were made to the place where the homicide occurred, and there he met and slew the deceased. It is also shown by the testimony of other witnesses that just prior to the homicide he made threats directed against the deceased. Concede, however, that the threats here were not admissible because there was no individuation of the deceased, yet we fail to see how it injured appellant. They were introduced, no doubt, for the purpose of showing express malice against the deceased, and so to characterize the killing as murder in the first degree. The jury, however, found appellant guilty of murder in the second degree, and assessed against him the lowest penalty for that offense. Under the theory of the State, appellant could not have been guilty of a less grade of offense than murder in the second degree, and the evidence evidently did not increase his punishment.

Appellant's wife was introduced on his behalf, and she testified that the feelings of the deceased, House, towards the defendant, Holley, were unfriendly. Defendant then asked her to state what she had heard House say, if anything, about her husband, Holley. The State objected, and the court sustained the objection. Appellant proposed to prove by this

witness the following declarations of House against her husband, to wit: "The deceased frequently upbraided me for not marrying his brother, and for marrying my husband, the defendant, who he said was a damn rascal; that he hated him on account of his marrying me, and taking my ducks to such a poor market; that if he got a chance he would make it hot for him, the little cur; that she told her husband of this feeling of House towards him, and warned him to beware of House." The court explains his refusal to admit this testimony as follows: "That he permitted the witness to state that the deceased entertained unfriendly feelings towards her husband, but declined to permit appellant to prove the details of what deceased said about her husband, unless the witness heard the deceased make a threat against her husband; and defendant's counsel replied that they did not expect to prove any threat against the defendant's life." So that it would appear that the court was not placed in possession of this testimony at the time, if it be insisted that it contains a threat against the life of defendant. As merely the details of a conversation expressing the animosity of the deceased towards appellant, we do not think it was admissible. The fact that the deceased did entertain such unfriendly feelings was admissible, and same was admitted by the court. The expression attributed by the witness to deceased, "that if he got a chance he would make it hot for him, the little cur," might indicate some sort of conditional threat, but it was not a threat to take life. At least, it does not appear to have been so considered by the counsel of appellant, who proposed to introduce the testimony. More than this, there was no act of appellant, even if it be regarded that this was a threat to take life, that same would have served the purpose of rendering it more potent; and, if appellant had the right of self-defense at all, he had it regardless of this threat. All of the witnesses testify that deceased was advancing on the appellant when he was shot; and the threat, if it be construed that it was a threat, would not render the action of the deceased any more significant than it appeared, without being coupled with such language.

We do not think there is anything in the contention of appellant that he was compelled to give testimony against himself in contravention of the bill of rights. He made a voluntary witness of himself, and took the stand, and it has been repeatedly held by this court that under such circumstances he stands in the attitude of any other witness, and subject to the same rigid rules of cross-examination. Besides this, it is not shown what the answers of the defendant to the questions would have been, save that he would have answered them affirmatively. Now, the fact that he would have testified to the questions propounded in said bill of exceptions in the affirmative does not indicate to us that said answers were injurious to appellant. Said questions were as follows: "Did you not talk with A. N. Bellamy, a witness for the State, at the gin near the gate about House?" The answer of the witness to this question would have been, "Yes." Again, "Did you not see House there?" He would have answered "Yes" to this. "Did you not talk to John Wemken near the

gate of the gin yard some minutes prior to the trouble?" He would have answered "Yes" to this. Now, these simple affirmative answers to these questions utterly fail to indicate how said answers could have possibly injured appellant. We have examined the record carefully, and, in our opinion, the evidence sustains the verdict, and the judgment is affirmed.

*Affirmed.*

HURT, Presiding Judge, absent.

### ON MOTION FOR REHEARING.

#### June 8, 1898.

HENDERSON, JUDGE.—At a former day of this term we affirmed this case, and it now comes before us on motion for rehearing. Appellant insists that we are in error in holding that the threat proved by Frank Ermis was admissible; and he also insists that appellant's wife should have been permitted to state the language used by House, the deceased, to her in regard to the defendant. Both of these questions were examined and decided against appellant in the former opinion. We held with reference to the threat proven by Ermis "that notwithstanding deceased was not named in connection with the threat, that it can be reasonably inferred that the threat was directed against him;" and we then stated the reasons which impelled us to this view. The able and exhaustive argument made by appellant's counsel has caused us to more critically investigate that question than was done in the original opinion. The testimony in regard to the threat in question was as follows: Frank Ermis testified that on the day of the homicide in question, and a short while (perhaps an hour) before the killing, defendant came to his store, which was a few miles from the gin where the homicide occurred, and called for his account, and settled the same; and he heard defendant say, "I will kill the God damn son of a bitch, and be in Mexico before morning." Witness stated that he did not know whom the defendant was talking about; that that was all that he heard; that shortly afterwards appellant left, and he went the road leading towards his (defendant's) house, which also led past the gin where the homicide occurred a little later. Appellant insists that this threat did not name the defendant, and, before it could be received in evidence against him, the threat itself must name deceased, or, in connection with the surrounding circumstances, it must be clearly shown that deceased was alluded to or meant by the threat. In Godwin v. State, 38 Texas Criminal Reports, 466, we examined this question in the light of the authorities, and we there laid down the rule as follows: "We hold the rule to be that evidence of general threats made by the defendant on trial for murder, when such threats are not shown to have been directed towards the person slain or to embrace such person, are inadmissible." Now, upon whom is the burden to show that the threat was directed towards the person slain, or embraced such person? Obviously, upon the State, for no presumptions can be indulged against the appellant. Before the testimony can be ad-

mitted, it must appear that the threat was directed towards the person slain. As stated, appellant, at the time he used the language imputed to him, named no person. It was not a threat of general malignity which might embrace all persons, but it was a threat directed against some particular person. We have none of the conversation of appellant at the time in connection with said language. It stands out in an isolated shape, and no light is afforded us from anything that was said at that time or in that connection; so that, if we arrive at the conclusion that deceased was meant, we must do so from the other facts and circumstances in the case. All of the facts and circumstances bearing upon this question presented in the testimony are as follows: Appellant and deceased were at enmity, and had been for some months previously; that on one occasion, about a month prior to the homicide, when appellant went to get a cow in the possession of the deceased, which his father-in-law had authorized him to get, he was prevented by deceased's wife and deceased from taking her. Thereupon he drew his pistol, as if to assault deceased; and then, in the presence of the deceased's wife, remarked that he would kill deceased some day when his wife was not present. And he is also shown, while at the gin on the evening of the homicide, and just before it occurred, to have stated to one Bellamy, "I see House is here," to which Bellamy replied, "You will monkey around some big man, and you will get the piss stamped out of you." Then defendant said, "I wish House would try this once; I would do him up." Wemken also testified that appellant approached him at the gin, and said to him, "I see House is here," to which witness replied, "Yes," and defendant said, "I am going to whip him." It is further shown that appellant went into the gin room where deceased and Wemkin were sitting down and whittling with their knives; that he walked up near them; and Wemken said to him, "Somebody is going to whip you to-day." Defendant said, "Well, if anybody thinks they can whip me, just let them try." Then House sprang up with a knife, and the difficulty began which resulted in the killing. These are all the facts which serve to shed any light on the question of who was meant by appellant in his threat made at the store of Ermis; or rather, these are all the circumstances which in the remotest degree tend to show that deceased was meant. Now, do they show with that degree of certainty which would authorize the threat to be used in evidence against appellant that, by the use of said language at the store, he meant the deceased, and no other person? It will not do to say that shortly afterwards, on the evening of the same day, he killed House, and therefore he must have meant him. Nor will it do to assume that, if appellant meant some one else, he knew whom he meant, and that it was incumbent on him to point out the person alluded to. We think the true rule is that the circumstances themselves, in connection with the threat, must with a reasonable degree of certainty establish the fact that appellant alluded to or directed the threat in question against deceased, before it can be admitted in evidence against him; and, if the circumstances in proof leave this matter in doubt, that doubt must be solved in favor of the defendant, and the

threat must be excluded. After a calm review of the testimony, we do not believe that the threat in question was admissible.

The remaining question is: Was the threat of a character, under the circumstances of this case, to prejudice or injure appellant? In the original opinion we said not; basing our decision on the fact that such threat did not interfere with or antagonize appellant's right of self-defense, and that at the least, under the theory of the State, appellant was guilty of murder in the second degree, and that the jury inflicted upon him the least punishment, and consequently he was not injured. In that view we believe we were mistaken. The admission of said testimony was equivalent to informing the jury that, in the opinion of the court, appellant, only a few hours before the fatal rencounter, had made a terrible threat to take the life of the deceased; and it was calculated to support and strengthen all the testimony of the State's witnesses tending to show an unprovoked assault and killing by appellant of deceased, and so to destroy and sweep away his theory of self-defense, which was supported alone by his own testimony. And, in that view, said testimony was evidently harmful, and calculated to prejudice appellant as to this theory of the case before the jury.

Appellant, as stated before, also insists that the court erred in holding the testimony of appellant's wife inadmissible. The bill of exceptions shows that said witness, Mrs. Holley, would have testified as follows: "That the deceased frequently upbraided me for not marrying his brother, and for marrying my husband [the defendant], whom he said was a damn rascal; that he hated him on account of his marrying me, and taking my ducks to such a poor market; that, if he got a chance, he would make it hot for him, the little cur;" that she told her husband of this feeling of House towards him, and warned him to beware of House. We believe on another trial of this case said testimony should be admitted. As a general rule, it is admissible in a murder trial, where self-defense is set up, to show that the deceased entertained unfriendly feelings towards the defendant; but the details of conversation showing animosity are generally held inadmissible. But, if proof of hatred or unfriendliness is admissible we can see no reason why the very language conveying and giving color to this feeling should be held inadmissible. It shows the exact state of feeling; and where, as in this cause, it is a condensed statement of the reasons for the unfriendly feeling, it will not serve to incumber the record, and should be admitted where the evidence would serve the purpose of showing the exact state of feeling and reasons therefor by the deceased towards the defendant. If the animus of the deceased in this case was admissible as tending to support his theory as to who was the aggressor in the difficulty, we can see no reason why an expression of this animosity should not be held admissible. The motion for rehearing is granted, and the judgment is reversed and the cause remanded.

*Motion granted. Reversed and remanded.*

HURT, Presiding Judge, absent.