## W. J. HILES v. THE STATE.

No. 2727.     Decided February 4, 1914.

### 1.—Murder—Manslaughter—Sufficiency of the Evidence.

Where, upon trial of murder and a conviction of manslaughter, the evidence sustained the conviction, there was no error on that ground.

### 2.—Same—Continuance—Bill of Exceptions.

Where the bill of exceptions to the court's refusal to grant a continuance, as accepted by the defendant, did not show any error in overruling the application, there was no error.

### 3.—Same—Evidence—Threats of Defendant.

Upon trial of murder there was no error in admitting in evidence a conversation between defendant and the witness which occurred some time prior to

Vol. 73 Crim.-2.

the homicide, in which defendant made some statement about what he would do with reference to killing a man under circumstances and conditions under which the killing occurred; besides, the bill of exceptions was defective. Following Conger v. State, 63 Texas Crim. Rep., 312, and other cases.

### 4.—Same—Rule Stated—Threats.

While the general rule is that the threat must be shown to have been made against the party in question, yet where the same is general and embraces all persons, it is admissible in evidence. Following Holley v. State, 39 Texas Crim. Rep., 301, and other cases.

### 5.—Same—Evidence—Bill of Exceptions.

Where defendant emphatically denied that he had used the language about which the witness was asked, there was no error in the court's refusal to permit said witness to explain such language; besides, the bill of exceptions was defective.

### 6.—Same—Evidence—Arrest—Statement by the Defendant.

Where, upon trial of murder, the record showed on appeal, that the defendant, when he made the declarations that the deceased was not armed at the time of the killing, did not consider himself under arrest and in fact was not under arrest, the same was admissible in evidence. Following Craig v. State, 30 Texas Crim. App., 619, and other cases.

### 7.—Same—Contradicting Witness—Charge of Court—Limiting Testimony.

Where, upon trial of murder, one of defendant's witnesses denied that he signed a certain written statement to which he swore before an officer, with reference to certain declarations by defendant and threats against the deceased, and the State was permitted to show by witnesses that said defendant's witness did make such written and sworn statement, the court should have properly limited this testimony to the credibility of said witness, and a failure to do so was reversible error. Prendergast, Presiding Judge, dissenting.

### 8.—Same—Evidence—Map.

Where, upon trial of murder, the court permitted a State's witness to make a map or plat of the ground to illustrate the position of the parties, etc., at the time of the homicide, but later withdrew said map and the testimony in connection therewith from the jury and orally instructed them not to consider it, defendant's complaint that the court should have done so in writing, in the absence of a requested charge shows no error.

Appeal from the District Court of Reeves. Tried below before the Hon. S. J. Isaacks.

Appeal from a conviction of manslaughter; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*Clay Cooke* and *J. W. Parker*, for appellant.—On question of overruling motion for continuance.: Philipps v. State, 31 S. W. Rep., 397; Morgan v. State, 54 Texas Crim. Rep., 542, 113 S. W. Rep., 934; Simmons v. State, 58 Texas Crim. Rep., 574, 126 S. W. Rep., 1157; Sharp v. State, 134 S. W. Rep., 333.

*C. E. Lane*, Assistant Attorney-General, for the State.

PRENDERGAST, Presiding Judge.—Appellant was indicted for the murder of Tom Tucker alleged to have occurred on December 19, 1912. He was indicted on April 24, 1913, at once arrested, and tried and con-

victed of manslaughter on May 24, 1913, and his punishment fixed at two years in the penitentiary,—the lowest prescribed by law.

The evidence on the State's side was amply sufficient to have sustained a verdict of murder in the first or second degree, but as appellant was convicted of manslaughter only, murder passed out of the case and it is unnecessary to recite the evidence or discuss anything about murder. The killing was admitted by appellant. Self-defense was appellant's only defense. There can be no question but that if the killing was not justifiable on the ground of self-defense it was manslaughter.

The record is rather voluminous, yet there are but few questions raised or necessary to be decided. Appellant has a printed brief containing more than 100 pages. Some eighty-two pages of this is devoted to appellant's contention that the court erred in overruling his motion for a continuance. The continuance was sought on the sole ground of the absence of appellant's brother-in-law, M. D. Sledge, who is shown to have left the State of Texas not later than May 10, 1913, and at the time of the trial was somewhere in the State of Oregon. Within a day or two after the killing an examining trial was held at which said Sledge was sworn, testified and his testimony taken down in writing, signed and sworn to by him. Appellant or his counsel was present, heard the testimony at the time and crossed him. It does not appear with certainty that the motion for continuance was contested and evidence heard at the time it was presented and acted upon by the court, but if not then, it does appear that when the motion for new trial was heard, the court then heard evidence on that ground. And after hearing all the evidence overruled the motion for new trial. It may be questionable whether the diligence used to secure the attendance of this witness was sufficient. We will not discuss that feature. The claim of appellant in his motion for new trial was that said Sledge was an eyewitness to the killing and he contended in his said motion that his testimony would tend to show or show that he, appellant, killed Tucker in self-defense and he claimed, in his said motion, that while he had the testimony of Sledge in writing that he could not use that on the trial because Sledge was in Texas at the time of the trial. His motion for a continuance also shows that he had a stenographic report of the testimony of said witness on the examining trial and that defendant "here now exhibits to the court a stenographic report of the testimony of said witness at said examining trial, and here alleges that same is correct, and asks that the court inspect same, and compare same with said original testimony of said witness."

The court, in approving the bill on this subject, did so with this explanation: "The witness, Sledge, is a brother-in-law of the defendant, he and the defendant having married sisters, and according to his, defendant and his wife's testimony, they were on perfectly friendly terms with the witness, Sledge, and in constant communication with him and his family.

"At the time the motion for a continuance was made and acted upon

by the court, the court believed that the witness Sledge's presence at the trial could have been obtained by the defendant had he so desired.

"At the time of overruling the motion for a continuance, the court stated to, defendant and his attorney that they would be permitted to use the testimony of the witness, Sledge, given at the examining trial, the said witness having testified at the examining trial and his testimony having been taken down in writing. He being examined in said examination by the defendant or his attorney.

"After the trial and conviction of defendant, the court having heard all of the evidence offered to sustain the motion for a continuance, and the defendant having been convicted of manslaughter and having been given by the verdict of the jury the minimum penalty of two years, the court considered that if there was error in overruling the motion for a continuance, that in view of the verdict of the jury such error was harmless in this: The witness, Sledge, in his testimony in the examining trial which was taken down in writing, subscribed and sworn to, testified to no facts that would have justified the killing. In other words, his testimony, at best, only showed manslaughter, he having testified that he was not looking at either of the parties instantly before the shooting of the deceased by the defendant, and testified to nothing showing an attempt on the part of the deceased to draw a weapon, and testified to nothing corroborating the defendant's testimony to the effect that deceased made a motion as if to draw a weapon. In other words, the witness' testimony given on the examining trial in no way tended to show self-defense, and at most, only tended to reduce the killing to the greater (grade of) manslaughter. And the court could not assume that the witness would testify on the trial of the case other or different facts than those to which he limited the testimony on the preliminary trial.

"In the trial of the case the defendant, of his own motion, introduced the testimony of the witness, Sledge, given on the examining trial, thereby, in the opinion of the trial court, waiving any error that might have been committed in overruling the motion for a continuance."

The appellant accepted this bill as qualified. It is settled beyond question in this State that when appellant accepts a bill as qualified, he is bound thereby. It is unnecessary to discuss the action of the court in this matter. As qualified the bill clearly shows that the court committed no error in overruling his application for a continuance and in overruling his motion for new trial because thereof.

In another bill, after the style, number of the cause, court and term and the usual "be it remembered," the bill says the following proceedings were had: "The State asked the witness, H. G. Paddock, the following question: 'Did you have some conversation with Mr. Hiles about your place sometime prior to the time Tom was killed, in which he made some statements about what he would do with reference to killing a man or men under certain conditions? Do you recall that?' To which the witness answered: 'Yes, can recall . . .' To which question and answer thereto, the defendant in open court then and there ob-

jected, on the ground that a general statement of that character was not admissible and would prejudice the rights of defendant; which objection by the defendant, was overruled by the court, and said witness allowed to testify as follows." Then the bill proceeds to quote the further testi-mony of this witness, which was to this effect: That two or three months before the killing appellant was around the witness' house for an hour or two, talking about the trouble which he, appellant, had with Bowen and Bowen's wife; and talking about the woman, he said she need not kick up such a hell of a muss about it, that she was easy enough three or four weeks before. He, appellant, said if such a thing happened at my place and he could get away, it would be all right, but if "I could catch him at it, I would kill the son-of-a-bitch; I would take my shotgun, loaded with buckshot, and shoot him the first time I could catch him." The witness said to him that would be a pretty harsh way of doing, and appellant replied if he got in trouble he would go to Pecos and employ Judge Ross to defend it for him; that he could get him out of most any kind of trouble; that he had succeeded in getting him out of this other trouble. This bill does not give any such statement of the facts surround-ing this testimony nor show why nor in what way it was admissible or in-admissible. In other words, the bill is wholly insufficient to require this court to consider it. James v. State, 63 Texas Crim. Rep., 75; Conger v. State, 63 Texas Crim. Rep., 312. However, if we could look to the record on this subject it would show, outside of appellant's claim of self-defense, that appellant did shoot and kill the deceased, from his standpoint, because the deceased attempted to do with his wife just what he said to this witness, Paddock, he would do to any man who attempted or succeeded with his wife,—that is, "I would take my shotgun loaded with buckshot and shoot him the first time I could catch him."

The rule is well established in this State that for a threat to be ad-missible it must be shown to be directly made with reference to the party against whom it is made. In other words, it must not be merely a general threat. If, however, although not directed specifically towards the per-son afterwards killed, if it was a threat of general malignity which em-braced all persons and thereby embraced the deceased, it would be ad-missible. (Holley v. State, 39 Texas Crim. Rep., 301.) Again, "threats directly or indirectly made are admissible upon the question of motive or malice and intention of the party subsequently acting appar-ently or directly in line with the threat made." (Owen v. State, 52. Texas Crim. Rep., 65.) Again, as said in Helvenston v. State, 53 Texas Crim. Rep., 636, where "appellant expressed himself as ready for trouble, would be admissible with a view of showing in connection with his act of preparation, reckless disregard of the safety of anyone and everyone who might antagonize him and as showing a malignant dispo-sition of all persons or at least such class of persons, as might or would embrace the deceased. In the case of Godwin v. State, 38 Texas Crim. Rep., 466, the court say: 'If a person declares that he intends to go upon the street, and kill some person, and straightway goes upon the

street, armed with a weapon, and slays an individual, evidence of the previous declaration made would be admissible, both as a part of the res gestae and as showing a malignant disposition towards all persons, which would embrace the person slain.' Again, in the case of Taylor v. State, 44 Texas Crim. Rep., 547, the statement considered was as follows: 'I am going to do some devilment and get my name in the paper.' The court held this was admissible because it showed a malignant disposition and suggested that the party was bent on mischief. Hardy v. State, 31 Texas Crim. Rep., 289; Mathis v. State, 34 Texas Crim. Rep., 39; Hall v. State, 88 S. W. Rep., 244." Again, in Mathis v. State, 34 Texas Crim. Rep., 39, supra, this court held that where the appellant two or three years prior to the homicide threatened to kill "any man who fooled with Mandy Smith" was pertinent and admissible. The threat in the Mathis case was made at a time when the deceased in that case had had nothing to do with Mandy Smith, but his relations with her began a long time afterwards. Again, in Anderson v. State, 15 Texas Crim. App., 447, it was shown that the appellant in that case threatened in a general way *white men,* not directed particularly towards the deceased, but that later he killed the deceased who was a white man and the court held that such general threat was admissible. Mr. Wharton, in his work on Criminal Evidence, vol. 2 (10 Ed.), p. 1703, says: "Conditional threats against any person who had done or might do a certain act, are relevant where it is shown that deceased did the act named, or brought himself within the condition," citing as instances threats made "to show that accused had threatened to kill any man who fooled with Mandy Smith; to show that accused had threatened to kill anybody who hits M. T. The fact that the jury may not believe that the deceased did the act upon which the threat was conditioned does not affect the relevancy of the threat." Again, on p. 1704, he says: "Threats by accused against a class of persons prima facie referable to deceased, though his name is not mentioned, are admissible against the accused. Thus, it is relevant to show threats of violence by the accused shortly before the homicide against policemen, though they are not directed against the deceased himself; to show that accused threatened to kill anyone found in the company of a certain lady; to show threats against all who might be concerned in the arrest of accused; to show threats against the family of which deceased was a member; to show threats against the race to which deceased belong."

So that even if we could consider the question attempted to be raised by this bill, the evidence objected to, if it was objected to by the above bill, was admissible.

In another bill, just as meager and without showing the circumstances of the case so that it could be told therefrom whether the testimony objected to was admissible or inadmissible, appellant complains that while he was on the stand, his counsel asked him this question: "If you stated to the first people whom you met that you had to do what you did in defense of your family, and did not go on and say 'in defense

of yourself,' what did you mean by that?" The State objected to this question that it was improper, leading, and it was for the jury to determine what he meant. The court sustained the State's objection and would not let him answer the question. He claims that if he had been permitted to answer the question he would have stated that if he made such declaration he meant that the insult to his family by the deceased was the cause of the trouble and resulted in the killing. The court, however, in allowing the bill qualified it by stating: "The witness was denied the privilege of stating what was meant by the term 'in defense of his family' as used by the witness testifying in conversation with him, because he had previously positively and emphatically denied that he had used such language, and at the time he was placed on the stand and asked this question he had not withdrawn his denial. A witness can not explain language which he denies having used." Clearly this bill shows no error on the part of the court.

In another bill, just as meager and as insufficient as the previous ones noticed, appellant complains that after he had testified for himself, the State placed T. Y. Moorehead on the stand and asked him if it was not a fact soon after the homicide he met· the defendant with his family on the road between the place of the homicide going towards Pecos and if he did not hear the following question asked the defendant: "Did Tom Tucker, the deceased, have a gun?" That he objected on the ground that he was under arrest at the time. The court overruled his objection and permitted the witness to answer that the appellant said: "No, no, Tucker did not have any pistol." The bill then states that he requested the court to be permitted to show that he was under arrest at the time and that the court admitted that Tom Harrison, the sheriff, and J. C. Prewit would testify that said sheriff had the defendant in his custody and had turned him over to his deputy sheriff, J. C. Prewit, and told Prewit to take him on to Pecos and said Prewit would testify that he would not have let the defendant get away; that he was taking him to Pecos. Neither of these persons, Harrison or Prewit, testified at all in the case. The court, in allowing the bill qualified it by stating: "The defendant, himself while upon the stand, and prior to the testimony of the witness, T. Y. Moorehead, had stated that at the time he had the conversation with T. Y. Moorehead, he did not consider himself under arrest. (Statement of facts, p. 46.)" The page of the statement of facts referred to by the court in giving appellant's testimony, shows that he testified: "Tom Harrison was sheriff of this county at that time. I met him coming out, and he sent me on back with Collie Prewit. I supposed that Collie Prewit was an officer; I did not know. As to whether or not I considered myself under arrest while with Mr. Prewit; I had never been arrested. I did not consider myself under arrest until I gave myself up to Mr. Harrison and Mr. Doty." As stated above, the appellant having accepted this bill as qualified, is bound thereby.

Of course, it is well settled—the statute does that itself—that a confession made by an accused, when under arrest and not in writing, etc.,

is inadmissible, but as said by this court, through Judge Henderson, in Connell v. State, 45 Texas Crim. Rep., 142: "It has been held that a statement or confession of an accused can not be used against him, although he had not been formally arrested by the officer, if he believes himself under arrest at the time he makes the statement. On the contrary, although the officer would not permit a person to depart, yet if a party does not reasonably believe himself to be under arrest, his confession can be used against him, though he has not been warned. The doctrine being that, if the testimony indicates the party reasonably believes or is conscious that he is under arrest, a confession made, unless he has been warned under the statute, can not be used against him," citing cases. This court, through Judge Hurt, in Craig v. State, 30 Texas Crim. App., 619, said:

"Over objection, the State introduced in evidence the confession of defendant made to Sue, Sawyer and Page. The statement of confession was made to these parties next morning after the cutting which resulted in the death of Manuel Cavasas. The objection urged was, that defendant was in arrest, and had not been cautioned as the law requires. The appellant was not cautioned. Was he in arrest, within the meaning of the statute? The facts are as follows: Sue states, that he, Sawyer, and Jim Page left home early that morning to hunt defendant. They went to another neighborhood, where another party, in charge of a constable, were also to go in search of defendant. Arriving at said place, they learned that the posse had gone on a similar mission to theirs. They went toward defendant's father's house for the purpose of finding defendant. They were on horseback, and had one gun with them. In about 200 yards of defendant's house they saw him going along the cross-road leading to Smith's place. They rode up to him, and spoke to him. The defendant stopped. They did not make any arrest or tell defendant he was under arrest, but their purpose was to take him to Fort Spunky to the justice. If the defendant had attempted to leave them, they would not have permitted him to do so. Do these facts show that defendant believed himself in arrest? Were they calculated to induce such belief? If defendant had reasonable grounds to believe and did believe himself in arrest, then his confession was inadmissible. On the other hand, if he did not so believe, his confession was admissible, though Sue, Sawyer, and Page intended an arrest, and would not have permitted him to escape. Did he believe himself in arrest? He certainly did not, because there was nothing said or done which was at all calculated to produce such belief."

Again in Hilcher v. State, 60 Texas Crim. Rep., 180, this court in discussing this question, through Judge Davidson, said: "It is true the officer said he did not intend to let him get away until he had satisfied himself about the matter, and that after he satisfied himself about the matter he did arrest appellant. Appellant was not conscious of the fact, so far as the record is concerned, that he was to be arrested, and it is not shown, as we understand this testimony, that he was under any

duress, or that he believed he was under duress when he made the statement. We are of opinion, therefore, these bills do not justify this court in reversing the judgment." To the same effect is the case of Martin v. State, 57 Texas Crim. Rep., 264. Again, as said by Judge Brooks for this court in Elsworth v. State, 54 Texas Crim. Rep., 38: "There is nothing here to show that appellant recognized it as a fact that he was under arrest, but as a matter of fact the statement shows that he was not at the time he made the statement. It is not the intention of the sheriff that controls the admission of testimony, but it is the fact that appellant is laboring under mental constraint and feels that he is under arrest that excludes the testimony." It is needless to cite other authorities. This bill does not show that the court erred in permitting this testimony.

The most serious question in the case is presented in appellant's motion for new trial, complaining that the court failed to limit the testimony of Max Krauskopf and J. A. Drane, wherein they testified that appellant's witness, Mit Thomas, signed a written statement and swore to it on the day of the homicide to the effect that he, Thomas, heard the defendant say prior to the homicide that he, the defendant or deceased one, must die, and that defendant claimed after the homicide to said witness that he had killed the deceased because of his conduct towards his family. Claiming that the failure to limit this testimony for impeachment purposes was calculated to prejudice the rights of the defendant in that the jury were calculated to and probably did take the declaration of the witness, Thomas, as evidence of the fact that the defendant had made the statement claimed by said witness. This is a fairly full and substantial statement of appellant's ground for a new trial. He also has a bill of exceptions presenting this objection to the failure of the court to charge on the subject.

The record shows this state of facts: Said witness, Thomas, was an employe of appellant and lived at his house; he stayed there the night preceding the homicide next morning; was at work there, as he claims, in full view of the killing, though about a half mile distant; that he knew appellant was going to see the deceased on the occasion, because of what the appellant claimed his wife, the night before, had told him of the deceased's insulting conduct towards her in attempting to induce her to have sexual intercourse with him and that he attempted to force open her door a night or two previous, for the purpose of having such intercourse with her; that he knew the appellant had his shotgun with him at the time he was going to see the deceased on this occasion; that he saw him approach deceased within about twenty yards and that both the appellant and the deceased then stopped; that he looked away at this time and did not see the shot fired by appellant which killed the deceased, but that immediately upon his hearing the shot, he again looked and saw that the deceased had fallen on the ground and the appellant was in the act of leaving the scene. Thomas denied making any written statement or statement at all to the effect above stated, as shown by said

ground of the motion. In the first part of his cross-examination he swore positively that he had not signed his name to any paper before said Krauskopf, but upon being shown the paper and his signature, he admitted that it was his signature and that he had signed and sworn to it. The statement was shown to have been made the day of the killing. Thomas then testified that he had testified as showing by that written statement and he then, in his testimony, quotes what that testimony was. On this particular feature the said testimony as quoted by him in his testimony at the time, states that "he (appellant) told me last night that one or the other of them would be killed. He said he had to uphold his family. I knew what he was going for when he left with the gun. I knew he was a man of his word." The defendant introduced said Krauskopf who testified on other features in appellant's favor. The State, then on cross-examination, proved up completely by him the said signed and sworn testimony of said witness, Thomas, and showed that four other persons were present at the time,—Mr. Hudson, Mr. Brady, Judge Rose and Mr. Drane. The State, in rebuttal, then clearly proved up the said written statement of the witness, Thomas, by both said witnesses Hudson and Drane, after which the said testimony of said Thomas was introduced and read in evidence.

At the time Mr. Krauskopf testified showing that the witness, Thomas, did testify and sign and swear to his testimony, as shown above, the appellant requested the following instruction, which was given,—with reference to Krauskopf's testimony—by the court: "You will not consider the evidence of this witness with reference to what the witness, Thomas, said at the inquest, or whatever it was, the day of the killing, except as going to the credibility of the witness, Thomas. That applies only to the testimony of Judge Krauskopf as given with reference to what Thomas testified." On this question the court elsewhere stated that neither the defendant nor his counsel requested a special charge covering this matter and it not being brought to his attention, was overlooked by him in giving his main charge. The court did not otherwise charge the jury that said testimony of Krauskopf and Drane could be considered by them only for impeaching Thomas. It is not shown that appellant objected to the failure of the court at the time of the trial when the charge was read, nor until after the verdict was rendered.

It will be noted that while the witness, Hudson, testified to the same thing as said Krauskopf and Drane, and while the said testimony of the witness, Thomas, after being fully proven up, itself was introduced in evidence by the State, that the appellant at no time and in no way complained of the failure of the court to limit that testimony at all. So that so far as he is concerned both the testimony of Hudson and the said sworn testimony of the witness, Thomas, was in evidence, no objection was then or even now made, because the court did not limit their testimony. His objection is that the court did not limit the testimony of Krauskopf and Drane. The court did limit the testimony of Krauskopf but omitted to limit that of Drane. It will also be noted that this

impeaching testimony of Thomas did not go to the question of appellant's claimed self-defense but it went to the fact of the killing of the deceased, or on the question of manslaughter. The killing was admitted. The killing unquestionably and without the shadow of a doubt was at least manslaughter, if appellant failed to establish his self-defense. The jury found him guilty of only manslaughter and fixed his punishment at the lowest prescribed by law. Then the question is, how has appellant been injured by the court's said failure? Or has he been injured at all by said failure? Our statute (C. C. P., art. 743) expressly prohibits this court from reversing a judgment, unless the error appearing from the record was calculated to injure the rights of the defendant. It is the uniform holding of this court in an unbroken line of decisions that although the testimony of one witness was inadmissible, when properly objected to at the time by an accussed, yet, if another witness testified to the same thing, when no objection was made, that the admission of the testimony objected to, does not present reversible error. Why does not that rule apply in this case? We can see no good reason why it should not. Here three separate and distinct witnesses did testify substantially and fully to the same thing, impeaching the testimony of said witness, Thomas, on this trial, and, in addition, the State proved up and introduced his own sworn testimony which was directly contradictory of his testimony on this trial, which, in effect, amounted to four witnesses testifying to the same impeaching testimony of the witness, Thomas. Upon such state of facts the appellant complains merely that the court did not charge limiting the testimony of two of these witnesses. The court did charge limiting one of them, but did not as to the other. As we stated above, no complaint was made either in the court below or in this, of the court's failure to limit the testimony of Hudson and in effect, the testimony of Thomas himself, proven up, introduced and shown to be directly the reverse of what he testified in this case. Besides, as shown above, the only time and way in which appellant raised the question, during the trial, was when he claimed that said testimony was admissible only for impeachment purposes; the court so recognized and as to Krauskopf so charged the jury. All this in the presence and hearing of the jury. Hence, we take it that the jury understood clearly from all this that said impeaching testimony of Thomas could be considered by them for that purpose alone and under all the facts and circumstances of this case, even if it be conceded that the court should have so charged limiting the testimony of Krauskopf and Drane, that it is not such error as should cause the reversal of this case. The above on the failure of the court to limit said testimony are my individual views, but my brethren are of the opinion the court's failure to limit said impeaching evidence is such error as requires a reversal.

Appellant has a bill complaining that the court permitted T. Y. Moorehead to make a map or plat of the ground and by it in his testimony illustrate and show the location of respective parties and surroundings at the time of the killing and that the court permitted that plat

to be introduced in evidence, at first over his objections, but later reconsidered his ruling and withdrew said evidence from the jury and orally instructed the jury not to consider it. This shows no error. Appellant's complaint of it is that the court did not, when he charged the jury in writing, again so instruct the jury, but the court explains that neither the appellant nor his counsel requested any such instructions at the time when he first withdrew it, or at any other time afterwards, and that his attention was not called to it. This bill shows no error.

These are all the questions raised and presented in this case. For the error of the court in failing to limit said impeaching evidence, the judgment is reversed and remanded.

*Reversed and remanded.*